U.S.D.C. E.D. OF PA. CASE #19cr462 - FILE

PHV

# U.S. District Court
## Western District of Missouri (Springfield)
## CRIMINAL DOCKET FOR CASE #: <u>6:17−cr−03142−BCW−1</u>

Case title: USA v. Jones                     Date Filed: 12/18/2017

---

Assigned to: District Judge Brian C.
Wimes
Referred to: Magistrate Judge David P.
Rush

**Defendant (1)**

**Donald Andrew Jones**          represented by   **Alan J. Tauber**
1221 Locust Street
3rd Floor
Philadelphia, PA 19107
(215) 575−0702
Email: atauber@lindyandtauber.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Status: Phv*

**Lisa G. Nouri**
2526 Holmes
Kansas City
Kansas City, MO 64108
816−547−5625
Fax: 816−416−7110
Email: lisanouri_atty@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Status: Active*

**Pending Counts**                          **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                       **Disposition**

CONSPIRACY TO DEFRAUD THE
UNITED STATES

(1)

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| USA | represented by | **Steven M. Mohlhenrich** |
|---|---|---|

United States Attorney's Office−Spgfd
901 St. Louis Street
Suite 500
Springfield, MO 65806−2511
(417) 831−4406
Fax: (417) 831−0078
Email: steven.mohlhenrich@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*
*Bar Status: Active*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/18/2017 | 1 | | WAIVER OF INDICTMENT by Donald Andrew Jones. (Berziel, Karla) (Entered: 12/18/2017) |
| 12/18/2017 | 2 | | INFORMATION as to Donald Andrew Jones (1) count(s) 1. (Berziel, Karla) (Entered: 12/18/2017) |
| 12/18/2017 | 3 | | ORDER REFERRING CASE to Magistrate Judge David P Rush as to Donald Andrew Jones.(Berziel, Karla) (Entered: 12/18/2017) |
| 12/18/2017 | 4 | | ORDER Authorizing Temporary Transfer of Custody as to Donald Andrew Jones. (Berziel, Karla) (Entered: 12/18/2017) |
| 12/18/2017 | 5 | | Minute Entry for proceedings held before Magistrate Judge David P. Rush: WAIVER OF INDICTMENT, FILING OF INFORMATION and PLEA TO INFORMATION as to Donald Andrew Jones (1) Count 1 held on 12/18/2017. Time in court: 9:02 a.m. to 9:14 a.m. To order a transcript of this hearing please contact Karla Berziel, 417−865−3869. DEFENDANT IN CUSTODY. (Berziel, Karla) (Entered: 12/18/2017) |
| 12/18/2017 | 6 | | NOTICE Regarding Entry of a Plea of Guilty as to Donald Andrew Jones. (Berziel, Karla) (Entered: 12/18/2017) |
| 12/18/2017 | 7 | | REPORT AND RECOMMENDATIONS on Plea of Guilty as to Donald Andrew Jones. Objections to R&R due by 1/2/2018 unless otherwise directed |

| | | by the court.(Berziel, Karla) (Entered: 12/18/2017) |
|---|---|---|
| 12/18/2017 | 8 | APPEARANCE BOND ENTERED as to Donald Andrew Jones. (Berziel, Karla) (Entered: 12/18/2017) |
| 12/18/2017 | 9 | ORDER setting conditions of release as to Donald Andrew Jones. Defendant released on a personal recognizance bond. (Berziel, Karla) (Entered: 12/18/2017) |
| 12/18/2017 | 10 | PLEA AGREEMENT as to Donald Andrew Jones (Mohlhenrich, Steven) (Entered: 12/18/2017) |
| 12/18/2017 | 11 | MOTION for order to Transfer and Notice of Related Cases Pursuant to Local Rule 83.9 by USA as to Donald Andrew Jones. Suggestions in opposition/response due by 1/2/2018 unless otherwise directed by the court. (Mohlhenrich, Steven) (Entered: 12/18/2017) |
| 12/27/2017 | 13 | ELECTRONIC TRANSCRIPT as to Donald Andrew Jones of HEARING ON WAIVER OF INDICTMENT, FILING OF INFORMATION AND PLEA TO INFORMATION held December 18, 2017 before Judge David P. Rush. Court Reporter: Lissa Whittaker, 816−914−3613, rapidtranscript@gmail.com. Number of pages: 12. NOTICE RE: REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the parties' intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.mow.uscourts.gov. Please read this policy carefully. **NOTICE: Attorneys must contact the court reporter for copies during this 90 day period. Notice of Intent to File Redaction of Transcripts due by 1/3/2018 unless otherwise directed by the court. Release of Transcript Restriction set for 3/26/2018.**(Whittaker, Lissa) (Entered: 12/27/2017) |
| 12/28/2017 | 14 | Motion to allow Alan J. Tauber to appear pro hac vice (Pro Hac fee $50 receipt number 0866−5574279) by Donald Andrew Jones. (Nouri, Lisa) (Entered: 12/28/2017) |
| 01/02/2018 | 15 | ORDER granting 14 motion to appear pro hac vice entered by Clerk of Court 1400 U.S. Courthouse, 222 John Q. Hammons Parkway, Springfield, Missouri 65806.<br><br>Counsel is entered as to Donald Andrew Jones (1) This is a TEXT ONLY ENTRY. No document is attached.(Geiser, Angel) (Entered: 01/02/2018) |
| 01/03/2018 | 16 | ORDER ADOPTING REPORT AND RECOMMENDATIONS for 7 concerning plea of guilty as to Donald Andrew Jones (1). Signed on January 3, 2018 by District Judge Roseann Ketchmark. (Wheeler, LaTandra) (Entered: 01/03/2018) |
| 01/04/2018 | 17 | ORDER granting 11 motion for order to Transfer and Notice of Related Cases Pursuant to Local Rule 83.9 as to Donald Andrew Jones (1). Signed on January 4, 2018 by District Judge Roseann Ketchmark. This is a TEXT ONLY ENTRY. No document is attached.(Wheeler, LaTandra) (Entered: 01/04/2018) |
| 01/04/2018 | 18 | ORDER TRANSFERRING CASE as to Donald Andrew Jones. Case transferred to District Judge Brian C. Wimes for all further proceedings. District Judge Roseann Ketchmark no longer assigned to case. Signed on January 4, |

| | | | |
|---|---|---|---|
| | | | 2018 by District Judge Roseann Ketchmark.This is a TEXT ONLY ENTRY. No document is attached.(Wheeler, LaTandra) (Entered: 01/04/2018) |
| 03/09/2018 | 19 | | MOTION for order *Preliminary Order of Forfeiture* by USA as to Donald Andrew Jones. Suggestions in opposition/response due by 3/23/2018 unless otherwise directed by the court. (Mohlhenrich, Steven) (Entered: 03/09/2018) |
| 03/13/2018 | 20 | | ORDER granting 19 MOTION for Preliminary Order of Forfeiture as to Donald Andrew Jones (1). Signed on 03/13/18 by District Judge Brian C. Wimes. (Carritt, Shelly) (Entered: 03/13/2018) |
| 08/12/2019 | 23 | | CONSENT TO TRANSFER JURISDICTION (Rule 20) to Eastern District of Pennsylvania Counts closed as to Donald Andrew Jones (1) Count 1. (Keller, Jeanne) (Entered: 08/12/2019) |

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Western District of Missouri

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 17-mj-2081DPR |
| DONALD ANDREW JONES | ) | |
| a/k/a "D.A." Jones, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: 12-18-17

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
Alan J. Tauber, Esq.
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
David P. Rush, United States Magistrate Judge
*Judge's printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | No. *17-03142 -01- CR-S-RK* |
| Plaintiff, | |
| | **COUNT 1:** |
| v. | 18 U.S.C. § 371 |
| | NMT 5 Years Imprisonment |
| **DONALD ANDREW JONES** | NMT $250,000 Fine |
| a/k/a "D.A." Jones, | NMT 3 Years Supervised Release |
| [ ███████ ] | Mandatory Restitution |
| | Class D Felony |
| Defendant. | |
| | **FORFEITURE ALLEGATION** |
| | 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C |
| | § 2461 |
| | |
| | $100 Special Assessment (Count 1) |

## I N F O R M A T I O N

**THE UNITED STATES ATTORNEY CHARGES THAT:**

### COUNT 1
(Conspiracy)

1.    At all times material to this Information, unless otherwise set forth, with all dates and times alleged to be "on or about" or "in or about," and all amounts alleged to be "approximately:"

### The Defendant

2.    The defendant, **DONALD ANDREW JONES**, also known as "D.A." Jones ("Jones"), a resident of Willingboro, New Jersey, was a Philadelphia, Pennsylvania-based political operative.   Jones owned and operated the firm, D.A. Jones & Associates, which purported to provide political and advocacy services, including consulting, analysis, and public relations.

**Alternative Opportunities, Inc. and Preferred Family Healthcare, Inc.**

3.     Preferred Family Healthcare, Inc. ("PFH"), formerly known as Alternative Opportunities, Inc. ("AO"), was a Missouri corporation headquartered at 1111 South Glenstone Avenue, in Springfield, Greene County, Missouri, within the Western District of Missouri.  Both AO and PFH were recognized by the Internal Revenue Service (IRS) as non-profit public charities under Section 501(c)(3) of the Internal Revenue Code (United States Code, Title 26).  PFH resulted from the May 1, 2015, merger between Alternative Opportunities, Inc. ("AO"), of Springfield, Missouri (Missouri corporate charter no. N00045067), and Preferred Family Healthcare, Inc., of Kirksville, Missouri (Missouri corporate charter no. N00024607).  AO was the acquiring entity, but the post-merger entity retained the PFH name and corporate registration with the Missouri Secretary of State.  (Hereinafter, "the Charity" shall refer to the entity over all times material to this Information, disregarding the Kirksville, Missouri-based Preferred Family Healthcare, Inc., that existed prior to May 2015, and is not relevant to this Information.)

4.     The Charity and its subsidiaries provided a variety of services to individuals, including the following:  mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services.

5.     For the fiscal years 2010 through 2016, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity had total revenue in the amounts indicated below:

| Fiscal Year | Entity | Total Revenue |
|---|---|---|
| FY2010 | AO | $   64,779,466 |
| FY2011 | AO | $   77,271,030 |
| FY2012 | AO | $   77,112,631 |
| FY2013 | AO | $   90,033,026 |
| FY2014* | AO | $   89,844,968 |

2

| Fiscal Year | Entity | Total Revenue |
|---|---|---|
| FY2014 | PFH | $ 66,264,806 |
| FY2015 | PFH | $ 127,276,627 |
| FY2016 | PFH | $ 180,737,583 |
| | Total: | $ 837,167,436 |

\* For AO, FY2014 ended 04/30/2015 because AO merged with the Kirksville, Missouri based Preferred Family Healthcare, Inc.

6. For the calendar years 2011 through 2016, the Charity received Medicaid reimbursements from the states of Arkansas, Kansas, Missouri, and Oklahoma, in the amounts indicated below:

| Medicaid Reimbursement by State (Total Reimbursements) | | | | |
|---|---|---|---|---|
| | Arkansas | Kansas | Missouri | Oklahoma | Total |
| 2011 | $ 22,917,095 | $ 114,653 | $ 12,051,231 | $ 5,984,647 | $ 35,082,979 |
| 2012 | $ 26,275,165 | $ 102,540 | $ 13,679,546 | $ 7,323,957 | $ 40,057,252 |
| 2013 | $ 28,843,342 | $ 1,012,503 | $ 14,411,117 | $ 8,977,498 | $ 44,266,962 |
| 2014 | $ 32,017,605 | $ 966,043 | $ 18,540,234 | $ 10,040,355 | $ 51,523,882 |
| 2015 | $ 35,521,005 | $ 918,288 | $ 32,424,388 | $ 10,000,473 | $ 68,863,682 |
| 2016 | $ 33,403,414 | $ 934,368 | $ 58,494,910 | $ 9,857,786 | $ 92,832,692 |
| Total | $ 178,977,627 | $ 4,048,395 | $149,601,427 | $ 52,184,716 | $384,812,165 |

| Medicaid Reimbursement by State (Federal Portion) | | | | |
|---|---|---|---|---|
| | Arkansas | Kansas | Missouri | Oklahoma | Total |
| 2011 | $ 16,355,931 | $ 67,703 | $ 7,627,224 | $ 3,886,430 | $ 24,050,858 |
| 2012 | $ 18,579,169 | $ 58,356 | $ 8,679,672 | $ 4,678,544 | $ 27,317,197 |
| 2013 | $ 20,227,835 | $ 572,166 | $ 8,844,102 | $ 5,745,599 | $ 29,644,103 |
| 2014 | $ 22,444,341 | $ 549,775 | $ 11,500,507 | $ 6,427,835 | $ 34,494,624 |
| 2015 | $ 25,177,289 | $ 520,026 | $ 20,573,248 | $ 6,230,295 | $ 46,270,563 |
| 2016 | $ 23,382,390 | $ 522,872 | $ 37,015,579 | $ 6,012,264 | $ 60,920,841 |
| Total | $ 126,166,955 | $ 2,290,898 | $ 94,240,332 | $ 32,980,967 | $255,679,153 |

7. For the fiscal years 2010 through 2015, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity received at least $53,411,253 in funds from the Federal government (more particularly, the Departments of Health and Human Services, Labor, Agriculture, Housing and Urban Development, Veterans Affairs, and

3

Justice), under programs involving grants, contracts, loans, guarantees, insurance, and other forms of Federal assistance, broken down by fiscal year (ending June 30), in the following amounts:

|  | USDA | HHS* | HUD | DOJ | DOL | VA |
|---|---|---|---|---|---|---|
| FY2010 | $ 9,295 | $ 848,054 | $ - | $ - | $ 3,122,098 | $ - |
| FY2011 | $ 9,330 | $ 1,368,239 | $ 33,403 | $ - | $ 3,488,094 | $ 381,266 |
| FY2012 | $ 9,213 | $ 1,731,955 | $ 116,906 | $ - | $ 3,145,749 | $ 352,841 |
| FY2013 | $ - | $ 2,500,587 | $ 89,455 | $ - | $ 3,324,939 | $ 377,969 |
| FY2014 (AO)** | $ - | $ 4,340,302 | $ - | $ 304,672 | $ 2,638,085 | $ - |
| FY2014 (PFH) | $ 80,348 | $ 6,888,549 | $ 99,248 | $ - | $ 780,862 | $ 62,328 |
| FY2015 | $ 142,059 | $ 12,312,338 | $ 102,273 | $ 39,868 | $ 4,637,628 | $ 73,300 |
| Total | $ 250,245 | $ 29,990,024 | $ 441,285 | $ 344,540 | $ 21,137,455 | $ 1,247,704 |

\* Not including Medicaid reimbursement.

\*\* For AO, FY2014 ended 04/30/2015 because AO merged with the Kirksville, Missouri based Preferred Family Healthcare, Inc.

### Persons

8.      "Person #1," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

9.      "Person #2," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

10.      "Person #3," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

11.      "Person #4," a resident of Rogers, Arkansas, was a lobbyist registered with the Arkansas Secretary of State.   Person #4 also was an employee of the Charity, serving as an

4

executive for company operations in the state of Arkansas.  Person #4 also operated the entities identified below as Lobbying Firm A and Lobbying Firm B.

12.    "Person #7," a resident of Melbourne, Arkansas, was an Arkansas legislator from 2006 through 2011, and a lobbyist registered with the Arkansas Secretary of State from January 20, 2011 onward.  Person #7 also was a member of the AO Board of Directors from October 2009 through May 2015.  Person #7 also was employed by the Charity, from February 2010 until February 2017.

## Entities

13.    Dayspring Behavioral Health Services ("Dayspring") was one of the business aliases that AO used to conduct business.  Doing business as Dayspring, AO operated dozens of clinics throughout the state of Arkansas, offering a variety of behavioral health services to individuals, families, and groups.

14.    Entity A was a Missouri limited liability company that was used as the management company for AO.  Entity A was formed in 1995 by Person #1, Person #2, Person #3, and four of their associates.  In 2006, Entity A was sold to a publicly-traded corporation by its five remaining owners, including Person #1, Person #2 and Person #3; however, Person #1 continued to exercise actual control over the bank accounts and activities of Entity A.

15.    Entity E was a Missouri S-corporation that was in the business of re-packaging and selling indoor thermostats imported from China.  Entity E was formed in 2006, using funds Person #1 and Person #2 received from the sale of Entity A to a publicly traded corporation.  Person #1 and Person #2 owned a combined 45.1086 percent share of Entity E, and a relative of Person #2 owned another 45.1086 percent.

16.     Lobbying Firm A was an Arkansas C-corporation and lobbying organization registered with the Arkansas Secretary of State.  Lobbying Firm A was solely owned and operated by Person #4, and purported to provide political services, including lobbying, consulting, and advocacy.

17.     Lobbying Firm B was a lobbying organization registered with the Arkansas Secretary of State, which listed a family member of Person #4 as its authorized representative.  On February 5, 2013, Person #4 opened a bank account at Bancorp South in the name of Person #4 doing business as Lobbying Firm B.

### Laws and Regulations Pertaining to Section 501(c)(3) Organizations

18.     The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury, responsible for the ascertainment, computation, assessment, and collection of taxes owed to the United States Treasury by individuals, corporations and other entities.  One of the IRS's missions was to oversee the operation of organizations exempt from income tax under Section 501(c)(3) of the Internal Revenue Code (Title 26 of the United States Code).

19.     Section 501(c)(3) of the Internal Revenue Code granted authorized charitable organizations tax-exempt status, which exempted them from having to pay any income tax on the donations they received.  To qualify for exemption under that section, an organization was required to file an IRS Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.  In this application, signed under penalties of perjury, the organization was required to demonstrate that it was organized and operated exclusively for charitable exempt purposes, and any non-exempt purpose was be incidental and not substantial to its operation.  Upon approval, the IRS would issue a determination letter that provided written assurance of the

6

organization's tax-exempt status, and its qualification to receive tax-deductible charitable contributions. Every organization qualifying for exemption under section 501(c)(3) would also be classified as either a "public charity" or a "private foundation."

20.     In accomplishing its oversight mission, the IRS primarily relied upon information reported annually by each tax-exempt organization. Additionally, in determining an organization's entitlement to tax-exempt status, the IRS utilized information provided by tax exempt organizations in response to specific IRS inquiries, information provided by other federal and state agencies, and members of the public.

21.     After the IRS granted an organization tax-exempt status, the organization was required to file an informational return, Form 990, "Return of Organization Exempt from Income Tax" each year in which an organization had gross receipts greater than or equal to $200,000 or total assets greater than or equal $500,000. The return was signed under penalties of perjury. Form 990 was an annual information return required to be filed with the IRS by most organizations exempt from income tax under section 501(a), and certain political organizations and nonexempt charitable trusts. Parts I through XII of the form were required to be completed by all filing organizations, and required reporting of the organization's exempt and other activities, finances, governance, compliance with certain federal tax filings and requirements, and compensation paid to certain persons. Additional schedules were required to be completed depending upon the activities and type of the organization. By completing Part IV, the organization determined which schedules were required. The entire completed Form 990 was filed with the IRS, except for certain contributor information on Schedule B (Form 990, 990-EZ, or 990-PF), which was required to be made available to the public by the IRS and the filing organization, and also could be required to be filed with state governments to satisfy state reporting requirements.

7

22.     Section 501(c)(3) organizations were required to report excess benefit transactions on Forms 990.  The term "excess benefit transaction" meant any transaction in which an economic benefit was provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeded the value of the consideration (including the performance of services) received for providing such benefit.  (For purposes of the preceding sentence, an economic benefit was not to be treated as consideration for the performance of services unless such organization clearly indicated its intent to so treat such benefit.)  The term "disqualified person" meant any person who was in a position to exercise substantial influence over the affairs of the applicable tax-exempt organization at any time during the five-year period ("lookback period") prior to the date of such transaction.

23.     Section 501(c)(3) organizations were required to disclose the existence of excess benefit transactions on page four (4) of IRS Form 990, by responding "yes" or "no" to questions 25(a) and 25(b) – disclosing whether they had such transactions in the current period, or had discovered past such transactions).  If the organization answered either question in the affirmative, it was required to describe the excess benefit transaction in Schedule L Part I of the Form 990.

24.     Section 501(c)(3) organizations were absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign on behalf of, or in opposition to, any candidate for elective public office.  Contributions to political campaign funds violated this prohibition, and could have resulted in denial or revocation of tax-exempt status and the imposition of certain excise taxes.

25.     Further, organizations not considered "electing organizations" (those making an election under Section 501(h), which election the Charity did not make) were subject to the "No Substantial Part" rule, which provided that no substantial part of the organization's activities could

8

constitute carrying on propaganda, or otherwise attempting to influence legislation.  So the IRS and the public could monitor tax-exempt organizations' compliance with the "No Substantial Part" Rule, Section 501(c)(3) organizations not making an election under Section 501(h), including the Charity, were required to disclose any and all lobbying activity in Part IX (Statement of Functional Expenses) of their annually-filed IRS Forms 990.

26.     Finally, all organizations seeking exemption under Section 501(c)(3) were required to conform to certain fundamental legal principles applicable to all charitable organizations.  One such principle was that charitable organizations could not engage in behavior that was illegal or violated public policy.  The "illegality doctrine" derived from English charitable trust law, the legal foundation on which Section 501(c)(3) was established.  Under charitable trust law, trusts violating law or public policy could not qualify for charitable status.

## Object of the Conspiracy

27.     From in or about April 2011, until in or about January 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, the defendant, **DONALD ANDREW JONES**, conspired and agreed with Person #1, Person #2, Person #3, Person #4, Person #7, and with others known and unknown to the United States Attorney, to execute a scheme whereby Person #1, Person #2, Person #3, and Person #4, being agents of Alternative Opportunities, Inc., and Preferred Family Healthcare, Inc., organizations receiving in each one-year period from July 1, 2010, through June 30, 2017, benefits in excess of $10,000 under the Federal programs set forth above, embezzled, stole, obtained by fraud, and without authority knowingly converted to their use, property worth at least $5,000 and under the care, custody, and control of such organization, that is funds totaling approximately $973,807.28; in violation of Title 18, United States Code, Section 666(a)(1)(A) and (a)(2).

9

## Manner and Means

28.     The manner and means by which Person #1, Person #2, Person #3, Person #4, Person #7, Jones, and others, carried out the scheme included but were not limited to the following:

29.     Person #1, Person #2, Person #3, and Person #4 and others known and unknown to the United States Attorney, devised and executed multiple schemes to embezzle, steal, and unjustly enrich themselves to the detriment of the Charity's mission, and to unlawfully use the Charity's funds for political contributions and excessive and unreported lobbying and political advocacy.

30.     As an integral and necessary part of their schemes to defraud, Person #1, Person #2, Person #3, Person #4, and others known and unknown to the United States Attorney, utilized the Charity's tax-exempt status to facilitate their embezzlement, theft, and unjust enrichment of themselves, and in order to maintain said tax-exempt status they concealed, covered up, and falsified evidence of their embezzlement, unjust enrichment, and excess benefit transactions to themselves and others, and of their unlawful use of the Charity's funds for political contributions and excessive and undisclosed lobbying and political advocacy, and failed to disclose the same to the IRS on the Charity's Forms 990 as required by law.

31.     It was a part of the scheme that in order to provide a veneer of legitimacy for the kickbacks paid to themselves and others, and to disguise the nature and source of the payments, Person #1, Person #2, Person #3, and Person #4 would and did cause the payments to be described in the books and records of the relevant entities as payments for business expenses, such as "consulting" and "training" services, and to that end they would and did cause the relevant entities to execute sham "consulting agreements."

32.     It was further a part of the scheme that in order to increase the supply of funds from which they could embezzle and steal, Person #1, Person #2, Person #3, and Person #4 would and

did cause the Charity to seek out and obtain additional sources of revenue, including grants and other program funds from the Federal government and from state governments and quasi-governmental entities.  To accomplish this objective, Person #1, Person #2, Person #3, and Person #4 would and did cause the Charity to engage in "political outreach" that violated both law and public policy, including the following:

a.      Person #1, Person #2, and Person #3, would and did employ lobbyists and advocates, including Person #4, to influence elected and appointed public officials to the financial benefit of the Charity, and themselves, while concealing and covering up the nature of the services the lobbyists and advocates provided to the Charity.

b.      Person #1, Person #2, and Person #3, through its lobbyists and advocates, including Person #4, would and did cause the Charity to contribute financially to elected officials and their political campaigns, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly.

c.      At the suggestion of lobbyists and advocates working for the Charity, Person #1, Person #2, and Person #3, would and did contribute and cause others to contribute financially, in their personal capacities, to elected officials and their political campaigns, and further would and did cause the Charity to reimburse the individuals making the contributions, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly.

11

33.     It was further a part of the scheme that Person #1, Person #2, Person #3, and Person #4 would and did cause the books, records, and public disclosures of the Charity to misrepresent, conceal, and cover up the nature of the services provided by the lobbyists and advocates, and financial contributions to elected officials and their political campaigns, by falsely describing such payments being for "training" and "consulting," and by causing the Charity to execute sham "consulting agreements," with  lobbyists and advocates.

34.     It was further a part of the scheme that Person #1, Person #2, Person #3, and Person #4 would and did instruct the persons providing the advocacy services to submit – and for persons employed by the Charity to create internally – invoices seeking payment from the Charity for services falsely described as "training" and "consulting," that were in truth and in fact lobbying, advocacy work, and kickbacks.

35.     It was further a part of the scheme that Person #1, Person #2, and Person #3 would and did cause the Charity to disburse funds to Lobbying Firm A and Lobbying Firm B for lobbying and advocacy services, and to disburse funds directly to persons providing lobbying and advocacy services.

36.     It was further a part of the scheme that Person #4, in addition to personally performing lobbying and advocacy services on behalf of the Charity, would and did use funds disbursed by the Charity to Lobbying Firm A and Lobbying Firm B to pay for lobbying and advocacy services performed by others, including Jones.

37.     It was further a part of the scheme that in or about 2011, Jones entered into an agreement with Person #1, Person #2, Person #3, and Person #4 that he would provide advocacy services for AO, including direct contact with legislators, legislators' offices, and government officials, in order to influence elected and appointed public officials to the financial benefit of AO.

12

38.     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials regarding legislative issues that impacted the Charity.

39.     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials in particular matters involving the Charity.

40.     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials in steering grants and other sources of funding to the Charity.

41.     It was further a part of the scheme that in exchange for Jones's services, the Charity would and did make payments to D.A. Jones & Associates, both directly and through other entities.

42.     It was further a part of the scheme that in order to conceal the nature of the services for which they caused the Charity to contract, Person #1, Person #2, Person #3, and Person #4 would and did describe the services provided by Jones as "consulting" services, and the payments made to Jones as payments pursuant to a "consulting agreement."

43.     It was further a part of the scheme that initially, and for more than four years, the conspirators did not put their agreement in writing.

44.     It was further a part of the scheme that on or about January 1, 2016, Person #3, on behalf of PFH, and Jones executed a sham "consulting agreement."

45.     It was further a part of the scheme that Jones agreed to pay ("kick back") a part of the funds Jones received from the Charity and the related entities to Person #4.

46.     It was further a part of the scheme that in order to conceal the nature and source of some of the funds the Charity paid to Jones, Person #1, Person #2 and Person #3 would and did

cause some of those payments to be routed through Entity A, Lobbying Firm A, and Lobbying Firm B.

47.     It was further a part of the scheme that Jones would and did pay kickbacks to Person #4, primarily by checks made payable to Person #4 or to Lobbying Firm A or Lobbying Firm B. Also, at the request of Person #4, Jones would and did make two payments to Person #7.

48.     It was further a part of the scheme that Person #1 and Person #2 would and did direct Jones to perform advocacy services on behalf of their for-profit corporation, Entity E, for which Entity E did not compensate Jones.

49.     It was further a part of the scheme that Person #1 and Person #2 would and did cause the Charity to compensate Jones for his work performed on behalf of Entity E.

### Overt Acts

50.     In furtherance of the conspiracy, and to accomplish its objects, the defendant **DONALD ANDREW JONES**, and Person #1, Person #2, Person #3, and Person #4, and others known and unknown to the United States Attorney, committed the following overt acts, among others, in the Western District of Missouri and elsewhere:

51.     In 2010, Person #4 requested Jones's assistance in responding to a U.S. Department of Labor audit of AO regarding overtime pay.

52.     On October 26, 2010, Jones emailed Person #4 a document entitled, "Proposal for Plan of Action." This document stated, "[t]he goal of this Plan of Action is to sway the Senate and House Committees to stand by the decisions made by the Department of Labor in their 1995 and 2006 letter and opinion documents concerning the Fair Labor Standards Act."

53.     On February 22, 2011, Person #3 e-mailed Jones, informing him that four members of the U.S. Senate, identified by name, and several members of the U.S. House of Representatives, also identified by name, could assist in their effort.

14

54.     On March 24, 2011, Jones e-mailed Person #4, stating:

Once again, it is great to hear that the Department of Labor has decided to withdraw its investigation of Alternative Opportunities. This was a big win!

Last week, I was in D.C. and took the time to reach out to ["U.S. Representative #1"], ["U.S. Representative #2"], ["U.S. Representative #3"] and ["U.S. Senator #1"] and thank them for their time and attentiveness to Alternative Opportunities and inform them that the investigation was dropped. They were pleased to hear about the positive turnout.

Not only have we achieved a positive outcome on the investigation, the time and effort also resulted in additional relationships for Alternative Opportunities.

55.     On March 25, 2011, Person #1 e-mailed Person #4, stating:  "Let me know when you receive the FedEx so I won't worry about it.  Want to make sure you and Mr. Don are taken care of."

56.     On May 4, 2011, Jones e-mailed Person #4, stating:

After much consideration, I strongly suggest that the Alternative Opportunities team make political contributions to the legislators that were key in our recent success.

Of course, since corporate contributions are not acceptable this would require individual contributions to be given.  The following legislators were very supportive in our success, [U.S. Senator #1], [U.S. Representative #2], [U.S. Representative #1], and [U.S. Representative #3].   Additionally, I would strongly suggest supporting newly elected (as of January 2011), ["U.S. Senator #2"].

Especially with [U.S. Representative #1] and [U.S. Senator #2], I wouldn't be surprised to find that neither have had an African American contributor. Not only would the company be supporting these legislators politically, but I believe that having these contributions provided through me would be poignant and further allow our contribution to not go unnoticed.

Let me know as I suggest acting sooner than later.

57.     On June 28, 2011, Jones emailed Person # 4, stating:

I have spoken with both ["U.S. Representative #4"] and [U.S. Representative #1] regarding Alternative Opportunities' behavioral health

15

services serving as a lead team for search and recovery efforts during the recent devastation in Joplin, Missouri. The Congressmen were very impressed by the efforts of AO and said that there are federal funds available from FEMA, because FEMA declared it a disaster area, to help recovery some of the costs associated with AO's lead team efforts.

They have requested that I get from AO the FEMA # associated with these efforts and the total costs that were spent in providing search and rescue/recovery efforts in Joplin, MO. Also, any information you have in regards to these efforts please send as well, as this would be greatly appreciated and support the efforts of the Congressmen.

Would you have this information readily available so that I may follow up with them as soon as possible since they have offered to assist?

Additionally, [U.S. Representative #4] will be having a fundraiser in Philadelphia, PA next week and has requested that you join him at the event. Please let me know what your schedule looks like for next week and I will follow up with the details.

58.     On October 13, 2011, Jones emailed Persons #1, #2, #3, #4, and #7, stating:

For the past several months, I have been actively putting forth efforts in Washington to support Alternative Opportunities attempt to collect federal funds to alleviate costs that were a result of the efforts put forth in Joplin, Missouri.

We have made great strides and have received positive feedback and support from both [U.S. Representative #4] and [U.S. Representative #1]. These efforts continue, and I am anticipating a positive outcome in the near future as I remain active in my outreach with the members of Congress, ensuring that this Alternative Opportunities request remains a top priority for all of your endeavors.

Recently, you requested that I send an invoice to account for my continued services in Washington on behalf of Alternative Opportunities. I wanted to follow up with you and make clear that this invoice accounts for the time and dedication that has been spent towards a positive outcome of your clients and building a stronger relationship for Alternative Opportunities with the Congressional Delegates in Washington and the state's you serve. However, my focus remains on our developed business relationship to tentatively begin January 1st, 2012.

With that understanding, I wanted to note that my current efforts have been and will remain focused on identifying myself as a point person for Alternative Opportunities, especially as we look forward to the beginning

16

of a long standing contract together. Therefore, I ask that this invoice be viewed as an investment into our business relationship and not an expectation for payment. If you strongly feel you would like to compensate me for services at a rate you feel appropriate, it would be greatly appreciate but by no means required.

Once again, I look forward to our continued work together and strengthening support in Washington. I appreciate your time and please let me know if you have any questions.

59.     On January 7, 2012,  Jones prepared a memorandum for Persons #2, #3, #4, and

one other person, with the subject line, "Recovery Schools," which included the following

statements:

    a.   We agree that having a collaboration of politicians that are tied to this issue would be key in building momentum and with that we strongly believe that [U.S. Representative #4] would be a key player.

    b.   Additionally, there is The Greater Philadelphia Association for Recovery Education based in Swarthmore, PA.  With this information, I am reaching out to [U.S. Representative #4] who currently serves on the Congressional Mental Health Caucus to get an indication of his affiliation and/or support of this school with the anticipation that we can engage him for support of AO's recovery schools agenda.

    c.   Additionally, I am reaching out to ["U.S. Representative #5"].  He seems to be supportive of mental health/substance abuse programs from our research and I am looking to connect with him in D.C. to introduce AO as well as to judge his support for recovery schools within the state.

60.     On July 27, 2012, Person #4 e-mailed Jones and Person #1, stating:

Hey don…[Person #1] and I are each going to send [U.S. Representative #3] a $2,500 donation…where do we send and how do we make out checks?

And what about [U.S. Representative #1]? We are supposed to meet soon with his chief of staff here…he is coming to tour our services…

61.     On July 27, 2012, Jones e-mailed Person #4, stating:

Below are the address and the name of each Congressman's campaign committee.

17

It is great that [U.S. Representative #1's] COS will be touring the facility. As you know, [U.S. Representative #1] was instrumental in supporting AO with previous outreach regarding the Deparment of Labor.

A contribution would be great way to show support of his efforts and strengthen AO's relationship.

If you prefer, I can personally deliver these checks directly to both [U.S. Representative #3] and [U.S. Representative #1] when I am in D.C. This would allow me to ensure that they are received directly by the Congressmen as opposed to be notified by their campaign staff down the road.

62.     On July 31, 2012, Person #4 e-mailed Jones, stating:  "We decided it might have more clout coming from you…should we mail the same amount to u for [U.S. Representative #1]"

63.     On January 27, 2013, Person #4 emailed an AO employee stating, in part:

Can you have someone write a letter to whom it may concern tomorrow for the purpose of getting Don Jones National Public Relations Director for Alternative Opportunities.   We need this on our AO letter head for me to sign, then we need the same letter written on [another entity's] letterhead for you to sign.  Here is DA info.  We need to get him an Arkansas Picture ID Card.

64.     On April 28, 2013, Person #3 e-mailed Jones, Person #2, and Person #4, stating: "I will be attending an event tues eve for [U.S. Representative #1] and taking checks from [Person #1] and myself --- will give your regards!"

65.     On November 19, 2013, Person #1 e-mailed Jones, regarding Government Bids, stating: "Thank you very much for helping [Entity E]."

66.     On January 6, 2014, Jones e-mailed Person #1 regarding Entity E's possible relocation to Pennsylvania, stating:

Good Afternoon! Just wanted to confirm with you the January 23rd meeting with [the mayor of a town in Pennsylvania]. The meeting will take place at 10am until approximately 3pm. The meeting will include discussion about the incentives available for relocation to the area as well as a tour of potential sites for the relocation.

67.     On March 5, 2014, Jones emailed Persons #1 and #2 regarding Entity E's eligibility

for government grants, stating:

> In researching opportunities for [Entity E], I am looking at the opportunities
> available within weatherization projects.  The federal government provides
> funding to states through the Weatherization Assistance Program.  Each
> state then has its own programs, which it allocates funding to local
> community action agencies, nonprofits and local governments to provide
> the actual services generally to low income residents who receive such
> services for free.  A key aspect of weatherization projects is the reduction
> of energy consumption, which made me think of programmable
> thermostats.
>
> With the registration that was completed, [Entity E] is registered in SAM
> (System for Awards Management), which is a federal database for the
> government to locate vendors.  However, we could go after contracts state
> by state, starting with Louisiana.
>
> Is this something that [Entity E] would like to be involved in if such
> opportunities to do so are available?
>
> Also, please note, that I continue to work on locating robotics funding for
> [Entity E].

68.     On March 5, 2014, Person #1 replied to Jones stating, "[s]ure we would be

interested in LA.  Also the robots could go into AO if not [Entity E].

69.     On March 5, 2014, Jones replied to Person #1 stating, "Really?? Non profit might

be a lot easier."

70.     On March 6, 2014, Person #1 replied to Jones stating, "Yes.  We met yesterday

doing strategic planning and AO would be willing to do the manufacturing to supplement

underfunded programs. Could be huge for them.   See what you can find. Thank you for all you

do."

71.     On February 21, 2015, Jones e-mailed Person #2 and another person, stating:

> It is great to finally see some communication from HUD. Our congressional
> outreach has been committed to reaching out to HUD until a final approval
> is reached.

19

It seems that HUD, as we have assumed, is all over the place and we need to remain active in seeking an answer. However, with our continued outreach I look forward to a positive outcome.

Please keep me updated so that I continue to update our congressional support on the status.

72.    On May 27, 2015, Jones e-mailed Person #3 and another person, stating:

The approach is to go to the overseeing executive level for answers with the support of key legislators in DC not only from Missouri, but also from key legislators across the country that reside on committees that oversee HUD in both the Senate and House.

73.    On June 3, 2015, Jones e-mailed Person #2, stating:

The H.R. 1735 is on its way to the Senate where the Senate has its own version of the bill in S. 1376. Due to the similarities of these bills a congressional conference committee is being organized to reach a compromise on the two bills to assist in its possible passage. I am in the process of reaching out to reach those assigned to this committee and express the stance of AO to have the bill protect the standards of Certified Mental Health Counselors as provided in the Senate version.

74.    On June 16, 2015, Jones e-mailed Person #2, stating "I wanted to give you an update following my meeting with HUD in DC."

75.    On January 21, 2016, Person #3 e-mailed Jones and Person #2 regarding preparing a written contract for Jones's services, stating: "Hey our auditor's told us that we need to have a written contract in place for you---do you have something or want me to draft one? I am glad to…"

76.    On March 16, 2016, Person #3 e-mailed Jones regarding a Department of Labor overtime pay issue that would financially impact AO, stating: "I will forward you a good article that details this situation…would you be able to get with [U.S. Representative #3] about it?"

77.    On June 10, 2016 Jones e-mailed Persons #1 and #2 regarding Entity E, stating:

I am preparing my outreach to potential clients for [Entity E]. Reviewing my materials on [Entity E], I have noticed that they are dated October 2013.

20

> Would you have available more recent marketing materials? I want to make
> sure that I have the most up to date materials to share with potential clients.

78.     In June 2017, Person #1 asked Jones to assist Entity E regarding a shipment of

thermostats from China that was being held by U.S. Customs in Kansas City, Missouri.

79.     On or about January 1, 2016, Person #3, on behalf of PFH, and Jones executed a

document entitled, "CONSULTING AGREEMENT," the main body of which described Jones's

"consulting duties" as follows:

> CONSULTING DUTIES:   Client retains Consultant as an independent
> contractor to provide to Client the consulting services more particularly
> described in Appendix A, which is attached and incorporated by reference
> as a part of the Agreement, and which can generally be described as
> government and public relations pertinent to the Client's development and
> delivery of management of treatment, employment, and training services.

While the main body of the "consulting agreement" listed duties generally consistent with those

of a professional hired as a consultant, an unsigned Appendix A more particularly described

Jones's duties not as consulting services, but as advocacy:

- Meet with elected or appointed officials, employees, departments,
  divisions, agencies, or boards or commissions of the executive branch
  of the government that may have an impact on Preferred Family
  Healthcare, Inc.

- Executive Branch assistance on issues before HUD, Department of
  Labor, VA, etc.

- Serve as a liaison between Preferred Family Healthcare, Inc. and federal
  department staff.

- Procurement issues relating Preferred Family Healthcare, Inc. existing
  contracts and grants.

- Federal Legislative issues including liaison with  U.S. Senators and
  Representatives

80.     On each of the dates set forth below, Persons #1, #2, #3 and #4 caused the Charity

to pay to Jones the amounts listed below, from or by way of the source accounts listed below:

|     | Date | Name on Source Account | Account no. (last 4) | Amount |
|-----|------|------------------------|----------------------|--------|
| A | 02/28/2011 | Person #4 dba Lobbying Firm B | 5171 | $2,000.00 |
| B | 03/24/2011 | Lobbying Firm A | 2316 | $2,000.00 |
| C | 04/09/2011 | Person #4 dba Lobbying Firm B | 5171 | $3,000.00 |
| D | 12/15/2011 | Lobbying Firm A | 2316 | $4,000.00 |
| E | 01/02/2012 | Entity A | 3101 | $72,000.00 |
| F | 10/08/2012 | Dayspring Behavioral Health Svc | 8747 | $2,813.38 |
| G | 01/01/2013 | Entity A | 3101 | $72,000.00 |
| H | 01/01/2013 | Entity A | 3101 | $48,000.00 |
| I | 01/18/2013 | Entity A | 3101 | $5,000.00 |
| J | 04/17/2013 | Lobbying Firm A | 2316 | $3,000.00 |
| K | 09/30/2013 | Alternative Opportunities, Inc. | 2595 | $60,000.00 |
| L | 12/05/2013 | Alternative Opportunities, Inc. | 2595 | $120,000.00 |
| M | 01/24/2014 | Dayspring Behavioral Health Svc | 8747 | $1,786.42 |
| N | 07/01/2014 | Alternative Opportunities, Inc. | 2595 | $30,000.00 |
| O | 07/25/2014 | Lobbying Firm A | 2316 | $2,350.00 |
| P | 08/22/2014 | Dayspring Behavioral Health Svc | 8747 | $1,000.00 |
| Q | 12/01/2014 | Alternative Opportunities, Inc. | 2595 | $120,000.00 |
| R | 02/03/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| S | 03/06/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| T | 03/17/2015 | Lobbying Firm A | 2316 | $10,000.00 |
| U | 03/30/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| V | 04/03/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| W | 04/06/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| X | 04/09/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| Y | 04/21/2015 | Lobbying Firm A | 2316 | $8,500.00 |
| Z | 04/22/2015 | Lobbying Firm A | 2316 | $6,500.00 |
| AA | 06/28/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| BB | 07/17/2015 | Preferred Family Healthcare, Inc. | 3560 | $1,349.96 |
| CC | 08/18/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| DD | 08/18/2015 | Lobbying Firm A | 2316 | $10,000.00 |
| EE | 08/23/2015 | Lobbying Firm A | 2316 | $12,500.00 |
| FF | 08/23/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| GG | 09/17/2015 | Preferred Family Healthcare, Inc. | 3609 | $991.80 |
| HH | 10/09/2015 | Preferred Family Healthcare, Inc. | 3587 | $1,200.00 |
| II | 10/29/2015 | Lobbying Firm A | 2316 | $15,000.00 |
| JJ | 11/17/2015 | Lobbying Firm A | 2316 | $5,000.00 |
| KK | 12/16/2015 | Preferred Family Healthcare, Inc. | 3587 | $150,000.00 |

|    | Date | Name on Source Account | Account no. (last 4) | Amount |
|----|------|------------------------|----------------------|--------|
| LL | 04/20/2016 | Preferred Family Healthcare, Inc. | 3587 | $5,000.00 |
| MM | 06/01/2016 | Preferred Family Healthcare, Inc. | 3587 | $1,315.72 |
| NN | 08/03/2016 | Lobbying Firm A | 2316 | $10,000.00 |
| OO | 12/14/2016 | Preferred Family Healthcare, Inc. | 3587 | $140,000.00 |
|    |      |                        | Total: | $973,807.28 |

81.     On September 30, 2013, December 5, 2013, July 1, 2014, December 1, 2014, December 16, 2015, April 20, 2016, and December 14, 2016, Persons #1, #2 and #3 caused the checks to Jones listed in the paragraph above to be falsely classified as a consulting expense in the books and records of the Charity, when in truth and in fact the checks were payments for Jones's advocacy services, including direct contact with elected and appointed public officials.

82.     On each of the dates set forth below, Jones sent payments in the amounts set forth below to the persons and entities set forth below:

|    | Deposit Date | Check/Wire Date | Payee | Amount |
|----|--------------|-----------------|-------|--------|
| A | 01/12/2012 | 01/02/2012 | Lobbying Firm A | $36,000.00 |
| B | 01/20/2012 | 01/20/2012 | Lobbying Firm A | $2,000.00 |
| C | 11/02/2012 | 10/26/2012 | Person #4 | $1,000.00 |
| D | 01/04/2013 | 01/01/2013 | Person #4 | $27,000.00 |
| E | 01/08/2013 | None | Person #7 | $25,000.00 |
| F | 10/04/2013 | 10/01/2013 | Person #4 | $20,000.00 |
| G | 10/04/2013 | 10/01/2013 | Lobbying Firm A | $20,000.00 |
| H | 12/31/2013 | 12/26/2013 | Person #7 | $20,000.00 |
| I | 01/03/2014 | 12/20/2013 | Person #4 | $25,000.00 |
| J | 07/24/2014 | 07/05/2014 | Lobbying Firm B | $15,000.00 |
| K | 01/07/2015 | 01/05/2015 | Person #4 | $7,000.00 |
| L | 01/21/2015 | 01/20/2015 | Person #4 | $6,000.00 |
| M | 01/26/2016 | 12/23/2015 | Person #4 | $30,000.00 |
| N | 01/17/2017 | 01/17/2017 | Person #4 | $30,000.00 |
|    |            |            | Total: | $264,000.00 |

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C § 2461)

83.     The factual allegations of Paragraphs One through Eighty-Two (1-82) of this Information are hereby re-alleged and incorporated as if fully set forth for the purpose of alleging forfeiture to the United States pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 371, 666, and Title 28, United States Code, Section 2461.

84.     As a result of the offenses alleged in Count One of this Information, and pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, the defendant, **DONALD ANDREW JONES**, shall forfeit to the United States all property, real and personal, constituting, or derived from, proceeds traceable to the offenses, directly or indirectly, as a result of the violations of law, including but not limited to:

### Money Judgment

85.     A money judgment representing proceeds obtained by **DONALD ANDREW JONES** in that the sum in aggregate, constitutes or is derived from proceeds traceable to the offenses set forth in Count One.

### Substitute Assets

86.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred, sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be divided without difficulty;

24

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of forfeitable property.

THOMAS M. LARSON
Acting United States Attorney

By: _____

STEVEN M. MOHLHENRICH
Assistant United States Attorney

ANNALOU TIROL
Acting Chief, Public Integrity Section

By: _____ for

SEAN F. MULRYNE
Trial Attorney, Public Integrity Section
United States Department of Justice

DATED: 12/18/17
Springfield, Missouri

25

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-03142-01-CR-S-RK |
| | ) | |
| | ) | |
| DONALD ANDREW JONES, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER OF REFERENCE TO
## UNITED STATES MAGISTRATE JUDGE

The Information in the above-styled cause was filed in the Southwestern Division of this Court on the 12th day of December, 2017, and was assigned to the undersigned United States District Judge.

Pursuant to Section 636(b), Title 28, United States Code, and Rule 72(j) of the Local Rules of Procedure of the United States District Court for the Western District of Missouri, it is hereby

ORDERED that United States Magistrate Judge David P. Rush is  designated to hear and determine all pretrial motions or matters now pending, or hereafter filed in this criminal action, except (1) a motion to dismiss or quash the Indictment, and (2) a motion to suppress evidence, in accordance with the provisions of Section 636(b)(1)(A), Title 28, United States Code; and such pretrial motions or matters now pending or hereafter filed in this criminal

action are hereby referred to the Magistrate Judge to hear and determine.

Any party may appeal from the Magistrate Judge's order determining a motion within (14) days after issuance of the order unless a different time is prescribed by the Magistrate judge or the undersigned District Judge.  Such party shall file with the Clerk of Court, and serve the Magistrate Judge and all parties, a written statement of the appeal, which shall specifically designate the order, or part thereof, appealed from and the basis for the appeal. The undersigned District Judge will consider the appeal and set aside any portion of the Magistrate Judge's order found to be clearly erroneous or contrary to law.  The undersigned District Judge may reconsider *sua sponte* any motion determined by the Magistrate Judge.  It is further

ORDERED that United States Magistrate Judge David P. Rush is designated to hear and process all pretrial motions to (1) dismiss or quash the Indictment, and (2) suppress evidence, now pending or hereafter filed in this criminal action, in accordance with the provisions of Section 636(b)(1)(B) and (b)(1)(C), Title 28, United States Code; and all such pretrial motions now pending or hereafter filed in this criminal action are hereby referred to the Magistrate Judge to hear and process.  Any party may object to the Magistrate Judge's proposed findings and recommendations in respect to (1) a motion to dismiss or quash the Indictment, or (2) a motion to suppress evidence, within ten (14) days after being served with a copy of the proposed findings and recommendations.  Such party shall file with the Clerk of Court and serve the Magistrate Judge and all parties written objections which shall specifically identify the portion or portions of the proposed findings and recommendations to which an

objection is made and the basis for each objection.

The undersigned District Judge will make a *de novo* determination of those portions of the proposed findings and recommendations to which specific objection is made, and may accept, reject or modify, in whole or in part, the proposed findings or recommendations made by the Magistrate Judge.  The undersigned District Judge need not conduct a new hearing and may consider only the record developed before the Magistrate Judge in making his *de novo* determination.  The undersigned District Judge may receive further evidence, recall witnesses, or recommit the motion to the Magistrate Judge with instructions.

ORDERED that the Magistrate Judge may, in his/her discretion, reassign any motions referred to him/her pursuant to this order, to another Magistrate Judge for processing and handling. In the event of such a reassignment, the Magistrate Judge to whom the motion is reassigned is designated to hear and determine or hear and process the motion in accordance with the provisions of this order.

/s/ Roseann Ketchmark

**UNITED STATES DISTRICT JUDGE**


Springfield, Missouri

Date:  December 18, 2017

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 17-03142-01-CR-S-RK |
| | ) | |
| DONALD ANDREW JONES, | ) | |
| | ) | |
| Defendant(s). | ) | |

## ORDER AUTHORIZING TEMPORARY TRANSFER OF CUSTODY ON CONSENT

Upon receipt of written consent from counsel for the United States and counsel for a defendant, the United States Marshal is authorized to temporarily transfer custody of that defendant, if a federal prisoner, to a federal law enforcement agency for the purpose of furthering a legitimate law enforcement purpose or investigation.   The defendant, whose custody is temporarily transferred pursuant to this authority, shall remain in the United States Courthouse, 222 North John Q. Hammons Parkway, Springfield, Missouri, or other facility in which the defendant is incarcerated, and shall be returned by the federal law enforcement agency to the United States Marshal's Service cell block or to the designated place of confinement no later than 4:00 p.m. on the day of the temporary transfer.

If custody of a defendant is temporarily transferred to a federal law enforcement agency pursuant to this authority, then a federal law enforcement agent of that agency shall be present with the defendant at all times.   Agents of the federal law enforcement agency to whom temporary custody of a defendant is transferred shall be responsible for the safe and secure custody of the defendant, as well as his well being, while he is in the temporary custody of that federal law enforcement agency.

**IT IS SO ORDERED**.

*IN THE UNITED STATES DISTRICT COURT FOR THE*
*WESTERN DISTRICT OF MISSOURI*
*SOUTHERN DIVISION*

**MINUTE SHEET**

**UNITED STATES OF AMERICA**                    **Date:**        **December 18, 2017**

**vs.**                                                        **Case No.:**   **17-03142-01-CR-S-RK**

**DONALD ANDREW JONES**

---

**Honorable David P. Rush, presiding at Springfield, Missouri**

**Nature of Hearing:**   **Waiver of Indictment**
**Initial Appearance/Arraignment on Information**
**Felony Plea**

**Time Commenced:  9:02 a.m.**                         **Time Terminated:  9:14 a.m.**

---

**APPEARANCES**

**Plaintiff:**      **Steve Mohlhenrich, AUSA**
**Defendant:**   **Alan J. Tauber, Retained**
**USPPTS:**     **Missy Potter, Damon Mitchell**

---

Proceedings:  Parties appear as indicated above, Defendant appears in person.

The Court notes that Defendant has signed a Waiver of Indictment [17-mj-2081-DPR].  Defendant advised of rights. The Court accepts the Waiver of Indictment and the Information is filed.  The Court notes that Defendant has signed a plea bargain agreement and consent to proceed before the Magistrate Judge pursuant to Rule 11.  Defendant advised of rights and pleads guilty to the One-count Information and the Forfeiture Allegation.

Defendant is duly sworn and questioned by the Court.  The Court finds an adequate factual basis for the plea of guilty and will recommend that it be accepted by the District Court.  PSI ordered.  Government has not moved for pretrial detention.

Defendant on bond.

---

**Courtroom Deputy/ERO:  Karla Berziel**

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

    v.

DONALD ANDREW JONES,

                    Defendant.

No. 17-03142-01-CR-S-RK

## NOTICE REGARDING ENTRY
## OF A PLEA OF GUILTY

In the event the Defendant decides at any time before trial to enter a plea of guilty, the United States Magistrate Judge is authorized by Rule 72.1(j)(26), WDMO Rules and 28 U.S.C. §636, with the consent of the Defendant, to conduct the proceedings required by Rule 11, F.R.Cr.P. incident to the making of the plea.  If, after conducting such proceedings, the Magistrate Judge recommends that the plea of guilty be accepted, a presentence investigation and report will be ordered pursuant to Rule 32, F.R.Cr.P.  The assigned United States District Judge will then act on the Magistrate Judge's Report and Recommendation; and, if the plea of guilty is accepted, will adjudicate guilt and schedule a sentencing hearing at which the District Judge will decide whether to accept or reject any associated plea agreement, and will determine and impose sentence.

1

## CONSENT

I hereby declare my intention to enter a plea of guilty in the above case, and I request and consent to the United States Magistrate Judge conducting the proceedings required by Rule 11, F.R.Cr.P., incident to the making of such plea.  I understand that if I object to the Magistrate Judge's Report and Recommendation within the time period required by law, the District Judge will review de novo those portions of the report or specified proposed findings or recommendations to which objections are made; however, the time period during which the District Judge conducts the review will be excluded in computing the time within which trial must commence under the Speedy Trial Act.  I also understand that if my plea of guilty is accepted by the District Judge, the District Judge will decide whether to accept or reject any plea agreement I may have with the United States, and will adjudicate guilt and impose sentence.

Date: 12 - 18 - 17

_____
Donald Andrew Jones
Defendant

_____
Alan J. Tauber, Esq.
Attorney for Defendant

The United States consents to the United States Magistrate Judge conducting the proceedings required by Rule 11, F.R.Cr.P., incident to the taking of a plea of guilty.

_____
Steven M. Mohlhenrich
Assistant United States Attorney

2

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
        vs.                     )       No. 17-03142-01-CR-S-RK
                                )
DONALD ANDREW JONES,            )
                                )
                Defendant.      )

## REPORT AND RECOMMENDATION
## <u>CONCERNING PLEA OF GUILTY</u>

The Defendant, by consent, has appeared before me pursuant to
Rule 11, F.R.Cr.P., 22(k)(26), WDMO, and 28 U.S.C. §636, and has
entered a plea of guilty to the sole count and admitted to Forfeiture
Allegation of the Information filed on December 18, 2017.  After
cautioning and examining the Defendant under oath concerning each
of the subjects mentioned in Rule 11, I determined that the guilty
plea was knowledgeable and voluntary, and that the offense charged
is supported by a factual basis for each of the essential elements
of the offense.  I therefore recommend that the plea of guilty be
accepted and that the Defendant be adjudged guilty and have sentence
imposed accordingly.

Date: December 18, 2017            /s/David P. Rush
                                   DAVID P. RUSH
                                   UNITED STATES MAGISTRATE JUDGE

<u>NOTICE</u>

Failure to file written objections to this Report and Recommendation within 14 days from the date of its service shall bar an aggrieved party from attacking such Report and Recommendation before the assigned United States District Judge. 28 U.S.C. §636(b)(1)(B).

AO 98 (Rev. 12/11) Appearance Bond

# UNITED STATES DISTRICT COURT
### for the
Western District of Missouri

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Donald Andrew Jones | )   Case No. 17-03142-01-CR-S-RK |
| | ) |
| *Defendant* | ) |

## APPEARANCE BOND

### Defendant's Agreement

I, _____ Donald Andrew Jones _____ *(defendant)*, agree to follow every order of this court, or any court that considers this case, and I further agree that this bond may be forfeited if I fail:

( ✕ )   to appear for court proceedings;
( ✕ )   if convicted, to surrender to serve a sentence that the court may impose; or
( ✕ )   to comply with all conditions set forth in the Order Setting Conditions of Release.

### Type of Bond

( ✕ ) (1)  This is a personal recognizance bond.

(    ) (2)  This is an unsecured bond of $ _____ .

(    ) (3)  This is a secured bond of $ _____ , secured by:

    (    ) (a) $ _____ , in cash deposited with the court.

    (    ) (b)  the agreement of the defendant and each surety to forfeit the following cash or other property *(describe the cash or other property, including claims on it − such as a lien, mortgage, or loan − and attach proof of ownership and value)*:

    If this bond is secured by real property, documents to protect the secured interest may be filed of record.

    (    ) (c)  a bail bond with a solvent surety *(attach a copy of the bail bond, or describe it and identify the surety)*:

### Forfeiture or Release of the Bond

*Forfeiture of the Bond.*  This appearance bond may be forfeited if the defendant does not comply with the above agreement.  The court may immediately order the amount of the bond surrendered to the United States, including the security for the bond, if the defendant does not comply with the agreement.  At the request of the United States, the court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond, including interest and costs.

AO 98 (Rev. 12/11) Appearance Bond

*Release of the Bond.*  The court may order this appearance bond ended at any time.  This bond will be satisfied and the security will be released when either: (1) the defendant is found not guilty on all charges, or (2) the defendant reports to serve a sentence.

### Declarations

*Ownership of the Property.*  I, the defendant – and each surety – declare under penalty of perjury that:

(1)     all owners of the property securing this appearance bond are included on the bond;
(2)     the property is not subject to claims, except as described above; and
(3)     I will not sell the property, allow further claims to be made against it, or do anything to reduce its value while this appearance bond is in effect.

*Acceptance.*  I, the defendant – and each surety – have read this appearance bond and have either read all the conditions of release set by the court or had them explained to me.  I agree to this Appearance Bond.

I, the defendant – and each surety – declare under penalty of perjury that this information is true.  (See 28 U.S.C. § 1746.)

Date:  12·18-17

_____
*Defendant's signature*

_____
*Surety/property owner – printed name*

_____
*Surety/property owner – signature and date*

_____
*Surety/property owner – printed name*

_____
*Surety/property owner – signature and date*

_____
*Surety/property owner – printed name*

_____
*Surety/property owner – signature and date*

*CLERK OF COURT*

Date:  _____

_____
*Signature of Clerk or Deputy Clerk*

Approved.

Date:  12/18/17

_____
*Judge's signature*

AO 199A (Rev. 12/11)  Order Setting Conditions of Release

Page 1 of ____3____ Pages

# UNITED STATES DISTRICT COURT
for the
Western District of Missouri

United States of America
v.

Donald Andrew Jones
_____
*Defendant*

)
)
)
)
)

Case No. 17-08142-01-CR-S-RK

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1)   The defendant must not violate federal, state, or local law while on release.

(2)   The defendant must cooperate in the collection of a DNA sample if it is authorized by 42 U.S.C. § 14135a.

(3)   The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4)   The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at: _____

*Place*

on _____

*Date and Time*

If blank, defendant will be notified of next appearance.

(5)   The defendant must sign an Appearance Bond, if ordered.

AO 199B  (Rev. 12/11)  Additional Conditions of Release                                    Page  2  of  3  Pages

## ADDITIONAL CONDITIONS OF RELEASE

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

(   )  (6)  The defendant is placed in the custody of:

Person or organization _____

Address *(only if above is an organization)* _____

City and state _____  Tel. No. _____

who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: _____   _____
                                        *Custodian*                           *Date*

( ✕ )  (7)  The defendant must:

( ✕ )  (a)  submit to supervision by and report for supervision to the   pretrial services as directed   ,
        telephone number _____ , no later than _____ .

( ✕ )  (b)  continue or actively seek employment.

(   )  (c)  continue or start an education program.

( ✕ )  (d)  surrender any passport to:   Pretrial Services

( ✕ )  (e)  not obtain a passport or other international travel document.

( ✕ )  (f)  abide by the following restrictions on personal association, residence, or travel:   Continental U.S. or as approved by U.S. Probation and Pretrial Services officer

( ✕ )  (g)  avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: _____

(   )  (h)  get medical or psychiatric treatment:   at the direction of the pretrial services officer.

(   )  (i)  return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purposes: _____

(   )  (j)  maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.

( ✕ )  (k)  not possess a firearm, destructive device, or other weapon.

( ✕ )  (l)  not use alcohol (   ) at all ( ✕ ) excessively.

( ✕ )  (m)  not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

( ✕ )  (n)  submit to testing for a prohibited substance if required by the pretrial services office or supervising officer.  Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing.  The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.

(   )  (o)  participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.

(   )  (p)  participate in one of the following location restriction programs and comply with its requirements as directed.
    (   ) (i)  **Curfew.**  You are restricted to your residence every day (   ) from _____ to _____ , or (   ) as directed by the pretrial services office or supervising officer; or
    (   ) (ii)  **Home Detention.**  You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or
    (   ) (iii)  **Home Incarceration.**  You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court.

(   )  (q)  submit to location monitoring as directed by the pretrial services office or supervising officer and comply with all of the program requirements and instructions provided.
    (   ) You must pay all or part of the cost of the program based on your ability to pay as determined by the pretrial services office or supervising officer.

( ✕ )  (r)  report as soon as possible, to the pretrial services office or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

( ✕ )  (s)  Report to Pretrial Services 30 minutes prior to any court appearance.

AO 199C   (Rev. 09/08)  Advice of Penalties

Page ___3___ of ___3___ Pages

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year.  This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court.  The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed.  If you are convicted of:

    (1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

    (2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

    (3) any other felony –  you will be fined not more than $250,000 or imprisoned not more than two years, or both;

    (4) a misdemeanor –  you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive.  In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release.  I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed.  I am aware of the penalties and sanctions set forth above.

_____
Defendant's Signature

_____
City and State

### Directions to the United States Marshal

( ✓ ) The defendant is ORDERED released after processing.

(    ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release.  If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: 12/18/17

_____
Judicial Officer's Signature

David P. Rush, U.S. Magistrate Judge
Printed name and title

DISTRIBUTION:   COURT     DEFENDANT     PRETRIAL SERVICE     U.S. ATTORNEY     U.S. MARSHAL

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

    v.                                 No. 17-03142-01-CR-S-RK

DONALD ANDREW JONES,

                Defendant.

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1.      **The Parties.**  The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Thomas M. Larson, Acting United States Attorney, and Steven M. Mohlhenrich, Assistant United States Attorney, and the defendant, Donald Andrew Jones ("the defendant"), represented by Alan J. Tauber, Esq.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2.      **Defendant's Guilty Plea**.  The defendant agrees to and hereby does plead guilty to **Count 1** of the information, charging him with a violation of **18 U.S.C. § 371**, that is, Conspiracy. The defendant also agrees to forfeit to the United States the property described in the Forfeiture Allegation of the Information.  By entering into this plea agreement, the defendant admits that he knowingly committed these offenses, and is, in fact, guilty of these offenses.

3.     **Factual Basis for Guilty Plea.**   The parties agree that the facts constituting the offenses to which the defendant is pleading guilty are as follows:

A.     **Defendant's Plea to Count 1 of the Information**

1)     The defendant, Donald Andrew Jones, also known as "D.A." Jones ("Jones"), a resident of Willingboro, New Jersey, was a Philadelphia, Pennsylvania-based political operative.

2)     Jones owned and operated the firm, D.A. Jones & Associates, which purported to provide political and advocacy services, including consulting, analysis, and public relations.

*Alternative Opportunities, Inc. and Preferred Family Healthcare, Inc.*

3)     Preferred Family Healthcare, Inc. ("PFH"), formerly known as Alternative Opportunities, Inc. ("AO"), was a Missouri corporation headquartered at 1111 South Glenstone Avenue, in Springfield, Greene County, Missouri, within the Western District of Missouri.  Both AO and PFH were recognized by the Internal Revenue Service (IRS) as non-profit public charities under Section 501(c)(3) of the Internal Revenue Code (United States Code, Title 26).  PFH resulted from the May 1, 2015, merger between Alternative Opportunities, Inc. ("AO"), of Springfield, Missouri (Missouri corporate charter no. N00045067), and Preferred Family Healthcare, Inc., of Kirksville, Missouri (Missouri corporate charter no. N00024607).  AO was the acquiring entity, but the post-merger entity retained the PFH name and corporate registration with the Missouri Secretary of State. (Hereinafter, "the Charity" shall refer to the entity over all times material to this Information, disregarding the Kirksville, Missouri-based Preferred Family Healthcare, Inc., that existed prior to May 2015, and is not relevant to this Information.)

4)     The Charity and its subsidiaries provided a variety of services to individuals, including the following:  mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services.

5)     For the fiscal years 2010 through 2016, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity had total revenue in the amounts indicated below:

| Fiscal Year | Entity | Total Revenue |
|---|---|---|
| FY2010 | AO | $    64,779,466 |
| FY2011 | AO | $    77,271,030 |
| FY2012 | AO | $    77,112,631 |
| FY2013 | AO | $    90,033,026 |

2

| Fiscal Year | Entity | Total Revenue |
|-------------|--------|---------------|
| FY2014* | AO | $ 89,844,968 |
| FY2014 | PFH | $ 66,264,806 |
| FY2015 | PFH | $ 127,276,627 |
| FY2016 | PFH | $ 180,737,583 |
| **Total:** | | **$ 837,167,436** |

\* For AO, FY2014 ended 04/30/2015 because AO merged with the Kirksville, Missouri based Preferred Family Healthcare, Inc.

6) For the calendar years 2011 through 2016, the Charity received Medicaid reimbursements from the states of Arkansas, Kansas, Missouri, and Oklahoma, in the amounts indicated below:

| Medicaid Reimbursement by State (Total Reimbursements) | | | | | |
|---|---|---|---|---|---|
| | Arkansas | Kansas | Missouri | Oklahoma | Total |
| 2011 | $ 22,917,095 | $ 114,653 | $ 12,051,231 | $ 5,984,647 | $ 35,082,979 |
| 2012 | $ 26,275,165 | $ 102,540 | $ 13,679,546 | $ 7,323,957 | $ 40,057,252 |
| 2013 | $ 28,843,342 | $ 1,012,503 | $ 14,411,117 | $ 8,977,498 | $ 44,266,962 |
| 2014 | $ 32,017,605 | $ 966,043 | $ 18,540,234 | $ 10,040,355 | $ 51,523,882 |
| 2015 | $ 35,521,005 | $ 918,288 | $ 32,424,388 | $ 10,000,473 | $ 68,863,682 |
| 2016 | $ 33,403,414 | $ 934,368 | $ 58,494,910 | $ 9,857,786 | $ 92,832,692 |
| Total | $ 178,977,627 | $ 4,048,395 | $149,601,427 | $ 52,184,716 | $384,812,165 |

| Medicaid Reimbursement by State (Federal Portion) | | | | | |
|---|---|---|---|---|---|
| | Arkansas | Kansas | Missouri | Oklahoma | Total |
| 2011 | $ 16,355,931 | $ 67,703 | $ 7,627,224 | $ 3,886,430 | $ 24,050,858 |
| 2012 | $ 18,579,169 | $ 58,356 | $ 8,679,672 | $ 4,678,544 | $ 27,317,197 |
| 2013 | $ 20,227,835 | $ 572,166 | $ 8,844,102 | $ 5,745,599 | $ 29,644,103 |
| 2014 | $ 22,444,341 | $ 549,775 | $ 11,500,507 | $ 6,427,835 | $ 34,494,624 |
| 2015 | $ 25,177,289 | $ 520,026 | $ 20,573,248 | $ 6,230,295 | $ 46,270,563 |
| 2016 | $ 23,382,390 | $ 522,872 | $ 37,015,579 | $ 6,012,264 | $ 60,920,841 |
| Total | $ 126,166,955 | $ 2,290,898 | $ 94,240,332 | $ 32,980,967 | $255,679,153 |

7) For the fiscal years 2010 through 2015, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity received at least $53,411,253 in funds from the Federal government (more particularly, the Departments of Health and Human Services, Labor, Agriculture, Housing and Urban Development, Veterans Affairs, and Justice), under programs involving grants, contracts, loans, guarantees, insurance, and other forms of Federal assistance, broken down by fiscal year (ending June 30), in the following amounts:

3

|  | USDA | HHS* | HUD | DOJ | DOL | VA |
|---|---|---|---|---|---|---|
| FY2010 | $ 9,295 | $ 848,054 | $ - | $ - | $ 3,122,098 | $ - |
| FY2011 | $ 9,330 | $ 1,368,239 | $ 33,403 | $ - | $ 3,488,094 | $ 381,266 |
| FY2012 | $ 9,213 | $ 1,731,955 | $ 116,906 | $ - | $ 3,145,749 | $ 352,841 |
| FY2013 | $ - | $ 2,500,587 | $ 89,455 | $ - | $ 3,324,939 | $ 377,969 |
| FY2014 (AO)** | $ - | $ 4,340,302 | $ - | $ 304,672 | $ 2,638,085 | $ - |
| FY2014 (PFH) | $ 80,348 | $ 6,888,549 | $ 99,248 | $ - | $ 780,862 | $ 62,328 |
| FY2015 | $ 142,059 | $ 12,312,338 | $ 102,273 | $ 39,868 | $ 4,637,628 | $ 73,300 |
| Total | $ 250,245 | $ 29,990,024 | $ 441,285 | $ 344,540 | $ 21,137,455 | $ 1,247,704 |

\* Not including Medicaid reimbursement.

\*\* For AO, FY2014 ended 04/30/2015 because AO merged with the Kirksville, Missouri based Preferred Family Healthcare, Inc.

*Persons*

8)        "Person #1," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

9)        "Person #2," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

10)        "Person #3," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

11)        "Person #4," a resident of Rogers, Arkansas, was a lobbyist registered with the Arkansas Secretary of State.  Person #4 also was an employee of the Charity, serving as an executive for company operations in the state of Arkansas.  Person #4 also operated the entities identified below as Lobbying Firm A and Lobbying Firm B.

12)        "Person #7," a resident of Melbourne, Arkansas, was an Arkansas legislator from 2006 through 2011, and a lobbyist registered with the Arkansas Secretary of State from January 20, 2011 onward.  Person #7 also was a member of the AO Board of Directors from October 2009 through May 2015.  Person #7 also was employed by the Charity, from February 2010 until February 2017.

4

*Entities*

13)    Dayspring Behavioral Health Services ("Dayspring") was one of the business aliases that AO used to conduct business.  Doing business as Dayspring, AO operated dozens of clinics throughout the state of Arkansas, offering a variety of behavioral health services to individuals, families, and groups.

14)    "Entity A" was a Missouri limited liability company that was used as the management company for AO.  Entity A was formed in 1995 by Person #1, Person #2, Person #3, and four of their associates.  In 2006, Entity A was sold to a publicly-traded corporation by its five remaining owners, including Person #1, Person #2 and Person #3; however, Person #1 continued to exercise actual control over the bank accounts and activities of Entity A.

15)    "Entity E" was a Missouri S-corporation that was in the business of re-packaging and selling indoor thermostats imported from China.  Entity E was formed in 2006, using funds Person #1 and Person #2 received from the sale of Entity A to a publicly traded corporation.  Person #1 and Person #2 owned a combined 45.1086 percent share of Entity E, and a relative of Person #2 owned another 45.1086 percent.

16)    "Lobbying Firm A" was an Arkansas C-corporation and lobbying organization registered with the Arkansas Secretary of State.  Lobbying Firm A was solely owned and operated by Person #4, and purported to provide political services, including lobbying, consulting, and advocacy.

17)    "Lobbying Firm B" was a lobbying organization registered with the Arkansas Secretary of State, which listed a family member of Person #4 as its authorized representative.  On February 5, 2013, Person #4 opened a bank account at Bancorp South in the name of Person #4 doing business as Lobbying Firm B.

*Laws and Regulations Pertaining to Section 501(c)(3) Organizations*

18)    The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury, responsible for the ascertainment, computation, assessment, and collection of taxes owed to the United States Treasury by individuals, corporations and other entities.  One of the IRS's missions was to oversee the operation of organizations exempt from income tax under Section 501(c)(3) of the Internal Revenue Code (Title 26 of the United States Code).

19)    Section 501(c)(3) of the Internal Revenue Code granted authorized charitable organizations tax-exempt status, which exempted them from having to pay any income tax on the donations they received.  To qualify for exemption under that section, an organization was required to file an IRS Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.  In this application,

5

signed under penalties of perjury, the organization was required to demonstrate that it was organized and operated exclusively for charitable exempt purposes, and any non-exempt purpose was be incidental and not substantial to its operation.   Upon approval, the IRS would issue a determination letter that provided written assurance of the organization's tax-exempt status, and its qualification to receive tax-deductible charitable contributions. Every organization qualifying for exemption under section 501(c)(3) would also be classified as either a "public charity" or a "private foundation."

20) In accomplishing its oversight mission, the IRS primarily relied upon information reported annually by each tax-exempt organization.  Additionally, in determining an organization's entitlement to tax-exempt status, the IRS utilized information provided by tax exempt organizations in response to specific IRS inquiries, information provided by other federal and state agencies, and members of the public.

21) After the IRS granted an organization tax-exempt status, the organization was required to file an informational return, Form 990, "Return of Organization Exempt from Income Tax" each year in which an organization had gross receipts greater than or equal to $200,000 or total assets greater than or equal to $500,000.  The return was signed under penalties of perjury.  Form 990 was an annual information return required to be filed with the IRS by most organizations exempt from income tax under section 501(a), and certain political organizations and nonexempt charitable trusts.  Parts I through XII of the form were required to be completed by all filing organizations, and required reporting of the organization's exempt and other activities, finances, governance, compliance with certain federal tax filings and requirements, and compensation paid to certain persons. Additional schedules were required to be completed depending upon the activities and type of the organization.  By completing Part IV, the organization determined which schedules were required.  The entire completed Form 990 was filed with the IRS, except for certain contributor information on Schedule B (Form 990, 990-EZ, or 990-PF), which was required to be made available to the public by the IRS and the filing organization, and also could be required to be filed with state governments to satisfy state reporting requirements.

22) Section 501(c)(3) organizations were required to report excess benefit transactions on Forms 990.  The term "excess benefit transaction" meant any transaction in which an economic benefit was provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeded the value of the consideration (including the performance of services) received for providing such benefit.  (For purposes of the preceding sentence, an economic benefit was not to be treated as consideration for the performance of services unless such organization clearly indicated its intent to so treat such benefit.)  The term "disqualified person" meant any person who was in a position to exercise substantial influence over the affairs of the applicable tax-exempt organization at any time during the five-year period ("lookback period") prior to the date of such transaction.

6

23)     Section 501(c)(3) organizations were required to disclose the existence of excess benefit transactions on page four (4) of IRS Form 990, by responding "yes" or "no" to questions 25(a) and 25(b) – disclosing whether they had such transactions in the current period, or had discovered past such transactions).  If the organization answered either question in the affirmative, it was required to describe the excess benefit transaction in Schedule L Part I of the Form 990.

24)     Section 501(c)(3) organizations were absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign on behalf of, or in opposition to, any candidate for elective public office.  Contributions to political campaign funds violated this prohibition, and could have resulted in denial or revocation of tax-exempt status and the imposition of certain excise taxes.

25)     Further, organizations not considered "electing organizations" (those making an election under Section 501(h), which election the Charity did not make) were subject to the "No Substantial Part" rule, which provided that no substantial part of the organization's activities could constitute carrying on propaganda, or otherwise attempting to influence legislation. So the IRS and the public could monitor tax-exempt organizations' compliance with the "No Substantial Part" Rule, Section 501(c)(3) organizations not making an election under Section 501(h), including the Charity, were required to disclose any and all lobbying activity in Part IX (Statement of Functional Expenses) of their annually-filed IRS Forms 990.

26)     Finally, all organizations seeking exemption under Section 501(c)(3) were required to conform to certain fundamental legal principles applicable to all charitable organizations.  One such principle was that charitable organizations could not engage in behavior that was illegal or violated public policy.  The "illegality doctrine" derived from English charitable trust law, the legal foundation on which Section 501(c)(3) was established.  Under charitable trust law, trusts violating law or public policy could not qualify for charitable status.

*Object of the Conspiracy*

27)     From in or about April 2011, until in or about January 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, the defendant, Donald Andrew Jones, conspired and agreed with Person #1, Person #2, Person #3, and Person #4, and with others known and unknown to the United States Attorney, to execute a scheme whereby Person #1, Person #2, Person #3, and Person #4, being agents of Alternative Opportunities, Inc., and Preferred Family Healthcare, Inc., organizations receiving in each one-year period from July 1, 2010, through June 30, 2017, benefits in excess of $10,000 under the Federal programs set forth above, embezzled, stole, obtained by fraud, and without authority knowingly converted to their use, property worth at least $5,000 and under the care, custody, and control of such organization, that is funds totaling

7

approximately $973,807.28; in violation of Title 18, United States Code, Section 666(a)(1)(A) and (a)(2).

*Manner and Means*

28)     The manner and means by which Person #1, Person #2, Person #3, Person #4, Person #7, Jones, and others, carried out the scheme included but were not limited to the following:

29)     Person #1, Person #2, Person #3, and Person #4 and others known and unknown to the United States Attorney, devised and executed multiple schemes to embezzle, steal, and unjustly enrich themselves to the detriment of the Charity's mission, and to unlawfully use the Charity's funds for political contributions and excessive and unreported lobbying and political advocacy.

30)     As an integral and necessary part of their schemes to defraud, Person #1, Person #2, Person #3, Person #4, and others known and unknown to the United States Attorney, utilized the Charity's tax-exempt status to facilitate their embezzlement, theft, and unjust enrichment of themselves, and in order to maintain said tax-exempt status they concealed, covered up, and falsified evidence of their embezzlement, unjust enrichment, and excess benefit transactions to themselves and others, and of their unlawful use of the Charity's funds for political contributions and excessive and undisclosed lobbying and political advocacy, and failed to disclose the same to the IRS on the Charity's Forms 990 as required by law.

31)     It was a part of the scheme that in order to provide a veneer of legitimacy for the kickbacks paid to themselves and others, and to disguise the nature and source of the payments, Person #1, Person #2, Person #3, and Person #4 would and did cause the payments to be described in the books and records of the relevant entities as payments for business expenses, such as "consulting" and "training" services, and to that end they would and did cause the relevant entities to execute sham "consulting agreements."

32)     It was further a part of the scheme that in order to increase the supply of funds from which they could embezzle and steal, Person #1, Person #2, Person #3, and Person #4 would and did cause the Charity to seek out and obtain additional sources of revenue, including grants and other program funds from the Federal government and from state governments and quasi-governmental entities.  To accomplish this objective, Person #1, Person #2, Person #3, and Person #4 would and did cause the Charity to engage in "political outreach" that violated both law and public policy, including the following:

> a.  Person #1, Person #2, and Person #3, would and did employ lobbyists and advocates, including Person #4, to influence elected and appointed public officials to the financial benefit of the Charity, and themselves, while concealing and covering up

8

the nature of the services the lobbyists and advocates provided to the Charity.

b.  Person #1, Person #2, and Person #3, through its lobbyists and advocates, including Person #4, would and did cause the Charity to contribute financially to elected officials and their political campaigns, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly.

c.  At the suggestion of lobbyists and advocates working for the Charity, Person #1, Person #2, and Person #3, would and did contribute and cause others to contribute financially, in their personal capacities, to elected officials and their political campaigns, and further would and did cause the Charity to reimburse the individuals making the contributions, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly.

33)  It was further a part of the scheme that Person #1, Person #2, Person #3, and Person #4 would and did cause the books, records, and public disclosures of the Charity to misrepresent, conceal, and cover up the nature of the services provided by the lobbyists and advocates, and financial contributions to elected officials and their political campaigns, by falsely describing such payments being for "training" and "consulting," and by causing the Charity to execute sham "consulting agreements," with  lobbyists and advocates.

34)  It was further a part of the scheme that Person #1, Person #2, Person #3, and Person #4 would and did instruct the persons providing the advocacy services to submit – and for persons employed by the Charity to create internally – invoices seeking payment from the Charity for services falsely described as "training" and "consulting," that were in truth and in fact lobbying, advocacy work, and kickbacks.

35)  It was further a part of the scheme that Person #1, Person #2, and Person #3 would and did cause the Charity to disburse funds to Lobbying Firm A and Lobbying Firm B for lobbying and advocacy services, and to disburse funds directly to persons providing lobbying and advocacy services.

36)  It was further a part of the scheme that Person #4, in addition to personally performing lobbying and advocacy services on behalf of the Charity, would and did use funds disbursed by the Charity to Lobbying Firm A and Lobbying Firm B to pay for lobbying and advocacy services performed by others, including Jones.

37)  It was further a part of the scheme that in or about 2011, Jones entered into an agreement with Person #1, Person #2, Person #3, and Person #4 that he would provide advocacy services for AO, including direct contact with legislators, legislators' offices, and

9

government officials, in order to influence elected and appointed public officials to the financial benefit of AO.

38)     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials regarding legislative issues that impacted the Charity.

39)     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials in particular matters involving the Charity.

40)     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials in steering grants and other sources of funding to the Charity.

41)     It was further a part of the scheme that in exchange for Jones's services, the Charity would and did make payments to D.A. Jones & Associates, both directly and through other entities.

42)     It was further a part of the scheme that in order to conceal the nature of the services for which they caused the Charity to contract, Person #1, Person #2, Person #3, and Person #4 would and did describe the services provided by Jones as "consulting" services, and the payments made to Jones as payments pursuant to a "consulting agreement."

43)     It was further a part of the scheme that initially, and for more than four years, the conspirators did not put their agreement in writing.

44)     It was further a part of the scheme that on or about January 1, 2016, Person #3, on behalf of PFH, and Jones executed a sham "consulting agreement."

45)     It was further a part of the scheme that Jones agreed to pay ("kick back") a part of the funds Jones received from the Charity and the related entities to Person #4.

46)     It was further a part of the scheme that in order to conceal the nature and source of some of the funds the Charity paid to Jones, Person #1, Person #2 and Person #3 would and did cause some of those payments to be routed through Entity A, Lobbying Firm A, and Lobbying Firm B.

47)     It was further a part of the scheme that Jones would and did pay kickbacks to Person #4, primarily by checks made payable to Person #4 or to Lobbying Firm A or Lobbying Firm B.  Also, at the request of Person #4, Jones would and did make two payments to Person #7.

10

48)     It was further a part of the scheme that Person #1 and Person #2 would and did direct Jones to perform advocacy services on behalf of their for-profit corporation, Entity E, for which Entity E did not compensate Jones.

49)     It was further a part of the scheme that Person #1 and Person #2 would and did cause the Charity to compensate Jones for his work performed on behalf of Entity E.

*Overt Acts*

50)     In furtherance of the conspiracy, and to accomplish its objects, the defendant Donald Andrew Jones, and Person #1, Person #2, Person #3, and Person #4, and others known and unknown to the United States Attorney, committed the following overt acts, among others, in the Western District of Missouri and elsewhere:

51)     In 2010, Person #4 requested Jones's assistance in responding to a U.S. Department of Labor audit of AO regarding overtime pay.

52)     On October 26, 2010, Jones provided a document entitled, "Plan of Action" to AO. This document stated, "[t]he goal of this Plan of Action is to sway the Senate and House Committees to stand by the decisions made by the Department of Labor in their 1995 and 2006 letter and opinion documents concerning the Fair Labor Standards Act."

53)     On February 22, 2011, Person #3 e-mailed Jones, informing him that four members of the U.S. Senate, identified by name, and several members of the U.S. House of Representatives, also identified by name, could assist in their effort.

54)     On March 24, 2011, Jones e-mailed Person #4, stating:

> Once again, it is great to hear that the Department of Labor has decided to withdraw its investigation of Alternative Opportunities. This was a big win!

> Last week, I was in D.C. and took the time to reach out to ["U.S. Representative #1"], ["U.S. Representative #2"], ["U.S. Representative #3"] and ["U.S. Senator #1"] and thank them for their time and attentiveness to Alternative Opportunities and inform them that the investigation was dropped. They were pleased to hear about the positive turnout.

> Not only have we achieved a positive outcome on the investigation, the time and effort also resulted in additional relationships for Alternative Opportunities.

11

55)    On March 25, 2011, Person #1 e-mailed Person #4, stating:  "Let me know when you receive the FedEx so I won't worry about it.  Want to make sure you and Mr. Don are taken care of."

56)    On May 4, 2011, Jones e-mailed Person #4, stating:

> After much consideration, I strongly suggest that the Alternative Opportunities team make political contributions to the legislators that were key in our recent success.

> Of course, since corporate contributions are not acceptable this would require individual contributions to be given.  The following legislators were very supportive in our success, [U.S. Senator #1], [U.S. Representative #2], [U.S. Representative #1], and [U.S. Representative #3].    Additionally, I would strongly suggest supporting newly elected (as of January 2011), ["U.S. Senator #2"].

> Especially with [U.S. Representative #1] and [U.S. Senator #2], I wouldn't be surprised to find that neither have had an African American contributor.  Not only would the company be supporting these legislators politically, but I believe that having these contributions provided through me would be poignant and further allow our contribution to not go unnoticed.

> Let me know as I suggest acting sooner than later.

57)    On June 28, 2011, Jones emailed Person # 4, stating:

> I have spoken with both ["U.S. Representative #4"] and [U.S. Representative #1] regarding Alternative Opportunities' behavioral health services serving as a lead team for search and recovery efforts during the recent devastation in Joplin, Missouri. The Congressmen were very impressed by the efforts of AO and said that there are federal funds available from FEMA, because FEMA declared it a disaster area, to help recovery some of the costs associated with AO's lead team efforts.

> They have requested that I get from AO the FEMA # associated with these efforts and the total costs that were spent in providing search and rescue/recovery efforts in Joplin, MO. Also, any information you have in regards to these efforts please send as well, as this would be greatly appreciated and support the efforts of the Congressmen.

12

Would you have this information readily available so that I may follow up with them as soon as possible since they have offered to assist?

Additionally, [U.S. Representative #4] will be having a fundraiser in Philadelphia, PA next week and has requested that you join him at the event. Please let me know what your schedule looks like for next week and I will follow up with the details.

58)     On October 13, 2011, Jones emailed Persons #1, #2, #3, #4, and #7, stating:

For the past several months, I have been actively putting forth efforts in Washington to support Alternative Opportunities attempt to collect federal funds to alleviate costs that were a result of the efforts put forth in Joplin, Missouri.

We have made great strides and have received positive feedback and support from both [U.S. Representative #4] and [U.S. Representative #1]. These efforts continue, and I am anticipating a positive outcome in the near future as I remain active in my outreach with the members of Congress, ensuring that this Alternative Opportunities request remains a top priority for all of your endeavors.

Recently, you requested that I send an invoice to account for my continued services in Washington on behalf of Alternative Opportunities. I wanted to follow up with you and make clear that this invoice accounts for the time and dedication that has been spent towards a positive outcome of your clients and building a stronger relationship for Alternative Opportunities with the Congressional Delegates in Washington and the state's you serve. However, my focus remains on our developed business relationship to tentatively begin January 1st, 2012.

With that understanding, I wanted to note that my current efforts have been and will remain focused on identifying myself as a point Person for Alternative Opportunities, especially as we look forward to the beginning of a long standing contract together. Therefore, I ask that this invoice be viewed as an investment into our business relationship and not an expectation for payment. If you strongly feel you would like to compensate me for services at a rate you feel appropriate, it would be greatly appreciate but by no means required.

13

Once again, I look forward to our continued work together and strengthening support in Washington. I appreciate your time and please let me know if you have any questions.

59)   On January 7, 2012, Jones prepared a memorandum for Persons #2, #3, #4, and one other Person, with the subject line, "Recovery Schools," which included the following statements:

  a.  We agree that having a collaboration of politicians that are tied to this issue would be key in building momentum and with that we strongly believe that [U.S. Representative #4] would be a key player.

  b.  Additionally, there is The Greater Philadelphia Association for Recovery Education based in Swarthmore, PA.   With this information, I am reaching out to [U.S. Representative #4] who currently serves on the Congressional Mental Health Caucus to get an indication of his affiliation and/or support of this school with the anticipation that we can engage him for support of AO's recovery schools agenda.

  c.  Additionally, I am reaching out to ["U.S. Representative #5"]. He seems to be supportive of mental health/substance abuse programs from our research and I am looking to connect with him in D.C. to introduce AO as well as to judge his support for recovery schools within the state.

60)   On July 27, 2012, Person #4 e-mailed Jones and Person #1, stating:

Hey don…[Person #1] and I are each going to send [U.S. Representative #3] a $2,500 donation…where do we send and how do we make out checks?

And what about [U.S. Representative #1]? We are supposed to meet soon with his chief of staff here…he is coming to tour our services…

61)   On July 27, 2012, Jones e-mailed Person #4, stating:

Below are the address and the name of each Congressman's campaign committee.

It is great that [U.S. Representative #1's] COS will be touring the facility. As you know, [U.S. Representative #1] was instrumental in

14

supporting AO with previous outreach regarding the Deparment of Labor.

A contribution would be great way to show support of his efforts and strengthen AO's relationship.

If you prefer, I can Personally deliver these checks directly to both [U.S. Representative #3] and [U.S. Representative #1] when I am in D.C. This would allow me to ensure that they are received directly by the Congressmen as opposed to be notified by their campaign staff down the road.

62)     On July 31, 2012, Person #4 e-mailed Jones, stating:  "We decided it might have more clout coming from you…should we mail the same amount to u for [U.S. Representative #1]"

63)     On January 27, 2013, Person #4 emailed an AO employee stating, in part:

Can you have someone write a letter to whom it may concern tomorrow for the purpose of getting Don Jones National Public Relations Director for Alternative Opportunities.   We need this on our AO letter head for me to sign, then we need the same letter written on [another Entity's] letterhead for you to sign.  Here is DA info.  We need to get him an Arkansas Picture ID Card.

64)     On April 28, 2013, Person #3 e-mailed Jones, Person #2, and Person #4, stating: "I will be attending an event tues eve for [U.S. Representative #1] and taking checks from [Person #1] and myself --- will give your regards!"

65)     On November 19, 2013, Person #1 e-mailed Jones, regarding Government Bids, stating:  "Thank you very much for helping [Entity E]."

66)     On January 6, 2014, Jones e-mailed Person #1 regarding Entity E's possible relocation to Pennsylvania, stating:

Good Afternoon! Just wanted to confirm with you the January 23rd meeting with [the mayor of a town in Pennsylvania]. The meeting will take place at 10am until approximately 3pm. The meeting will include discussion about the incentives available for relocation to the area as well as a tour of potential sites for the relocation.

67)     On March 5, 2014, Jones emailed Persons #1 and #2 regarding Entity E's eligibility for government grants, stating:

15

In researching opportunities for [Entity E], I am looking at the opportunities available within weatherization projects. The federal government provides funding to states through the Weatherization Assistance Program. Each state then has its own programs, which it allocates funding to local community action agencies, nonprofits and local governments to provide the actual services generally to low income residents who receive such services for free. A key aspect of weatherization projects is the reduction of energy consumption, which made me think of programmable thermostats.

With the registration that was completed, [Entity E] is registered in SAM (System for Awards Management), which is a federal database for the government to locate vendors. However, we could go after contracts state by state, starting with Louisiana.

Is this something that [Entity E] would like to be involved in if such opportunities to do so are available?

Also, please note, that I continue to work on locating robotics funding for [Entity E].

68)     On March 5, 2014, Person #1 replied to Jones stating, "[s]ure we would be interested in LA. Also the robots could go into AO if not [Entity E]."

69)     On March 5, 2014, Jones replied to Person #1 stating, "Really?? Non profit might be a lot easier."

70)     On March 6, 2014, Person #1 replied to Jones stating, "Yes. We met yesterday doing strategic planning and AO would be willing to do the manufacturing to supplement underfunded programs. Could be huge for them.   See what you can find. Thank you for all you do."

71)     On February 21, 2015, Jones e-mailed Person #2 and another Person, stating:

It is great to finally see some communication from HUD. Our congressional outreach has been committed to reaching out to HUD until a final approval is reached.

It seems that HUD, as we have assumed, is all over the place and we need to remain active in seeking an answer. However, with our continued outreach I look forward to a positive outcome.

16

Please keep me updated so that I continue to update our congressional support on the status.

72)    On May 27, 2015, Jones e-mailed Person #3 and another Person, stating:

The approach is to go to the overseeing executive level for answers with the support of key legislators in DC not only from Missouri, but also from key legislators across the country that reside on committees that oversee HUD in both the Senate and House.

73)    On June 3, 2015, Jones e-mailed Person #2, stating:

The H.R. 1735 is on its way to the Senate where the Senate has its own version of the bill in S. 1376. Due to the similarities of these bills a congressional conference committee is being organized to reach a compromise on the two bills to assist in its possible passage. I am in the process of reaching out to reach those assigned to this committee and express the stance of AO to have the bill protect the standards of Certified Mental Health Counselors as provided in the Senate version.

74)    On June 16, 2015, Jones e-mailed Person #2, stating "I wanted to give you an update following my meeting with HUD in DC."

75)    On January 21, 2016, Person #3 e-mailed Jones and Person #2 regarding preparing a written contract for Jones's services, stating:  "Hey our auditor's told us that we need to have a written contract in place for you---do you have something or want me to draft one? I am glad to…"

76)    On March 16, 2016, Person #3 e-mailed Jones regarding a Department of Labor overtime pay issue that would financially impact AO, stating:  "I will forward you a good article that details this situation…would you be able to get with [U.S. Representative #3] about it?"

77)    On June 10, 2016 Jones e-mailed Persons #1 and #2 regarding Entity E, stating:

I am preparing my outreach to potential clients for [Entity E]. Reviewing my materials on [Entity E], I have noticed that they are dated October 2013. Would you have available more recent marketing materials? I want to make sure that I have the most up to date materials to share with potential clients.

17

78)     In June 2017, Person #1 asked Jones to assist Entity E regarding a shipment of thermostats from China that was being held by U.S. Customs in Kansas City, Missouri.

79)     On or about January 1, 2016, Person #3, on behalf of PFH, and Jones executed a document entitled, "CONSULTING AGREEMENT," the main body of which described Jones's "consulting duties" as follows:

> CONSULTING DUTIES:   Client retains Consultant as an independent contractor to provide to Client the consulting services more particularly described in Appendix A, which is attached and incorporated by reference as a part of the Agreement, and which can generally be described as government and public relations pertinent to the Client's development and delivery of management of treatment, employment, and training services.

While the main body of the "consulting agreement" listed duties generally consistent with those of a professional hired as a consultant, an unsigned Appendix A more particularly described Jones's duties not as consulting services, but as advocacy:

- Meet with elected or appointed officials, employees, departments, divisions, agencies, or boards or commissions of the executive branch of the government that may have an impact on Preferred Family Healthcare, Inc.

- Executive Branch assistance on issues before HUD, Department of Labor, VA, etc.

- Serve as a liaison between Preferred Family Healthcare, Inc. and federal department staff.

- Procurement issues relating Preferred Family Healthcare, Inc. existing contracts and grants.

- Federal Legislative issues including liaison with  U.S. Senators and Representatives

80)     On each of the dates set forth below, Persons #1, #2, #3 and #4 caused the Charity to pay to Jones the amounts listed below, from or by way of the source accounts listed below:

|   | Date | Name on Source Account | Account no. (last 4) | Amount |
|---|------|------------------------|----------------------|--------|
| A | 02/28/2011 | Person #4 dba Lobbying Firm B | 5171 | $2,000.00 |
| B | 03/24/2011 | Lobbying Firm A | 2316 | $2,000.00 |

18

| | Date | Name on Source Account | Account no. (last 4) | Amount |
|---|---|---|---|---|
| C | 04/09/2011 | Person #4 dba Lobbying Firm B | 5171 | $3,000.00 |
| D | 12/15/2011 | Lobbying Firm A | 2316 | $4,000.00 |
| E | 01/02/2012 | Entity A | 3101 | $72,000.00 |
| F | 10/08/2012 | Dayspring | 8747 | $2,813.38 |
| G | 01/01/2013 | Entity A | 3101 | $72,000.00 |
| H | 01/01/2013 | Entity A | 3101 | $48,000.00 |
| I | 01/18/2013 | Entity A | 3101 | $5,000.00 |
| J | 04/17/2013 | Lobbying Firm A | 2316 | $3,000.00 |
| K | 09/30/2013 | Alternative Opportunities, Inc. | 2595 | $60,000.00 |
| L | 12/05/2013 | Alternative Opportunities, Inc. | 2595 | $120,000.00 |
| M | 01/24/2014 | Dayspring Behavioral Health Svc | 8747 | $1,786.42 |
| N | 07/01/2014 | Alternative Opportunities, Inc. | 2595 | $30,000.00 |
| O | 07/25/2014 | Lobbying Firm A | 2316 | $2,350.00 |
| P | 08/22/2014 | Dayspring Behavioral Health Svc | 8747 | $1,000.00 |
| Q | 12/01/2014 | Alternative Opportunities, Inc. | 2595 | $120,000.00 |
| R | 02/03/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| S | 03/06/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| T | 03/17/2015 | Lobbying Firm A | 2316 | $10,000.00 |
| U | 03/30/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| V | 04/03/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| W | 04/06/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| X | 04/09/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| Y | 04/21/2015 | Lobbying Firm A | 2316 | $8,500.00 |
| Z | 04/22/2015 | Lobbying Firm A | 2316 | $6,500.00 |
| AA | 06/28/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| BB | 07/17/2015 | Preferred Family Healthcare, Inc. | 3560 | $1,349.96 |
| CC | 08/18/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| DD | 08/18/2015 | Lobbying Firm A | 2316 | $10,000.00 |
| EE | 08/23/2015 | Lobbying Firm A | 2316 | $12,500.00 |
| FF | 08/23/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| GG | 09/17/2015 | Preferred Family Healthcare, Inc. | 3609 | $991.80 |
| HH | 10/09/2015 | Preferred Family Healthcare, Inc. | 3587 | $1,200.00 |
| II | 10/29/2015 | Lobbying Firm A | 2316 | $15,000.00 |
| JJ | 11/17/2015 | Lobbying Firm A | 2316 | $5,000.00 |
| KK | 12/16/2015 | Preferred Family Healthcare, Inc. | 3587 | $150,000.00 |

19

|     | Date | Name on Source Account | Account no. (last 4) | Amount |
|-----|------|------------------------|----------------------|--------|
| LL | 04/20/2016 | Preferred Family Healthcare, Inc. | 3587 | $5,000.00 |
| MM | 06/01/2016 | Preferred Family Healthcare, Inc. | 3587 | $1,315.72 |
| NN | 08/03/2016 | Lobbying Firm A | 2316 | $10,000.00 |
| OO | 12/14/2016 | Preferred Family Healthcare, Inc. | 3587 | $140,000.00 |
|    |    |    | **Total:** | **$973,807.28** |

81)     On September 30, 2013, December 5, 2013, July 1, 2014, December 1, 2014, December 16, 2015, April 20, 2016, and December 14, 2016, Persons #1, #2 and #3 caused the checks to Jones listed in the paragraph above to be falsely classified as a consulting expense in the books and records of the Charity, when in truth and in fact the checks were payments for Jones's advocacy services, including direct contact with elected and appointed public officials.

82)     On each of the dates set forth below, Jones sent payments in the amounts set forth below to the Persons and entities set forth below:

|     | Deposit Date | Check/Wire Date | Payee | Amount |
|-----|--------------|------------------|-------|--------|
| A | 01/12/2012 | 01/02/2012 | Lobbying Firm A | $36,000.00 |
| B | 01/20/2012 | 01/20/2012 | Lobbying Firm A | $2,000.00 |
| C | 11/02/2012 | 10/26/2012 | Person #4 | $1,000.00 |
| D | 01/04/2013 | 01/01/2013 | Person #4 | $27,000.00 |
| E | 01/08/2013 | None | Person #7 | $25,000.00 |
| F | 10/04/2013 | 10/01/2013 | Person #4 | $20,000.00 |
| G | 10/04/2013 | 10/01/2013 | Lobbying Firm A | $20,000.00 |
| H | 12/31/2013 | 12/26/2013 | Person #7 | $20,000.00 |
| I | 01/03/2014 | 12/20/2013 | Person #4 | $25,000.00 |
| J | 07/24/2014 | 07/05/2014 | Lobbying Firm B | $15,000.00 |
| K | 01/07/2015 | 01/05/2015 | Person #4 | $7,000.00 |
| L | 01/21/2015 | 01/20/2015 | Person #4 | $6,000.00 |
| M | 01/26/2016 | 12/23/2015 | Person #4 | $30,000.00 |
| N | 01/17/2017 | 01/17/2017 | Person #4 | $30,000.00 |
|   |   |   | **Total:** | **$264,000.00** |

20

B.     **Defendant's Admission of the Forfeiture Allegation**

83)     The defendant admits and acknowledges that he received a total of $973,807.28 from Alternative Opportunities, Inc. and Preferred Family Healthcare, Inc., both directly and indirectly.

84)      The defendant admits and acknowledges he willfully blinded himself to (in other words, deliberately avoided learning or recognizing) the following facts, which should have been obvious to him: (a) Person #1, Person #2, Person #3 and Person #4 made some payments to him indirectly in order to conceal on the Charity's books and records the full amount he was paid; (b) Person #1, Person #2, and Person #3 caused the Charity to pay him as a "consultant" in order to conceal the nature of his services for the Charity, which were advocacy and lobbying; and (c) that his compensation for work done on behalf of Entity E, which was Person #1's and Person #2's for-profit company, should have been paid by Entity E, and not the Charity.

85)     The defendant further admits and acknowledges that he kicked back to Person #4 $219,000 of the amount he received by way of this scheme, and at Person #4's direction paid over an additional $45,000 of that amount to Person #7.

86)     In admitting the Forfeiture Allegation of the Information, the defendant acknowledges he understands a money judgment will be entered against him in an as-yet unspecified amount, based on the facts set forth above.

4.     **Use of Factual Admissions and Relevant Conduct.**  The defendant acknowledges, understands and agrees that the admissions contained in paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2).   The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the indictment, as well as all other uncharged, related criminal activity, may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which he is pleading guilty.

21

5.      **Statutory Penalties.**  The defendant further understands that, upon his plea of guilty to Count 1 of the information, charging him with a violation of 18 U.S.C. § 371, that is, Conspiracy, the maximum penalty the Court may impose is not more than 5 years' imprisonment, not more than three years' supervised release, a $250,000 fine, an order of restitution, an order of forfeiture, and a $100 mandatory special assessment per felony count of conviction, which must be paid in full at the time of sentencing.  The defendant further understands that this offense is a Class D felony.

6.      **Sentencing Procedures.**  The defendant acknowledges, understands and agrees to the following:

a.      in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

b.      the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

c.      in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three years; the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

d.      if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to two years without credit for time previously spent on supervised release.  In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of the defendant's first supervised release;

e.      the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

f.      any sentence of imprisonment imposed by the Court will not allow for parole;

22

g.      the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

h.      the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

i.      The defendant agrees that the United States may institute civil, judicial or administrative forfeiture proceedings against all forfeitable assets in which the defendant has an interest, and that he will not contest any such forfeiture proceedings;

j.      The defendant agrees to forfeit all interests he owns or over which he exercises control, directly or indirectly, in any asset that is subject to forfeiture to the United States, either directly or as a substitute for property that was subject to forfeiture but is no longer available for the reasons set forth in 21 U.S.C. § 853(p) (which is applicable to this action pursuant to 28 U.S.C. § 2461(c). With respect to any asset which the defendant has agreed to forfeit, the defendant waives any constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the United States Constitution. The forfeited funds will be deposited into the Asset Forfeiture Fund. Forfeiture of the defendant's property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment or any other penalty the Court may impose on the defendant in addition to forfeiture. However, defendant understands that the Monetary Penalties Unit of the United States Attorney's Office for the Western District of Missouri may, in its discretion, submit a restoration request as to the forfeited funds to the Money Laundering and Asset Recovery Section (MLARS), Criminal Division, U.S. Department of Justice, and if granted, these funds would be provided by the Department of Justice to the Clerk of the Court for the payment of restitution in this case. Defendant understands that whether to approve or deny this request, in whole or in part, is entirely within the discretion of the Chief of MLARS.

k.      The defendant agrees to fully and truthfully disclose the existence, nature and location of all assets forfeitable to the United States, either directly or as a substitute asset, in which he, his co-defendants and his co-conspirators have or had any direct or indirect financial interest, or exercise or exercised control, directly or indirectly, during the period from **April 9, 2011** to the present. The defendant also agrees to fully and completely assist the United States in the recovery and forfeiture of all such forfeitable assets;

23

l.    The defendant specifically agrees and authorizes any state or local law enforcement agency having possession of property subject to federal forfeiture to release the property to a federal agency, either prior to or after entry of an order forfeiting the defendant's interest in such property.  Further, the defendant agrees to hold harmless any state or local law enforcement agency which releases such property to any federal agency for federal forfeiture proceedings;

m.    The defendant agrees to take all necessary steps to comply with the forfeiture matters set forth herein before his sentencing;

n.    Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit:  (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office.  The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility; and

o.    At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of forfeitable assets and restitution.

7.    **Government's Agreements.**  Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to the crimes charged in the information for which it has venue and which arose out of the defendant's conduct described above.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the Person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises

24

made by the defendant in this agreement.  If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence.  The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement.  The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement.  The defendant further understands and agrees that, if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

8.      **Preparation of Presentence Report.**  The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct.  This may include information concerning the background, character and conduct of the defendant, including the entirety of his criminal activities.  The defendant understands these disclosures are not limited to the counts to which he has pleaded guilty.  The United States may respond to comments made or positions taken by the defendant or the defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement.  The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9.      **Withdrawal of Plea.**  Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court.  In the event of such withdrawal, the parties will be restored to

their pre-plea agreement positions to the fullest extent possible.  However, after the plea has been formally accepted by the Court, the defendant may withdraw his pleas of guilty only if the Court rejects the plea agreement, or if the defendant can show a fair and just reason for requesting the withdrawal.  The defendant understands that, if the Court accepts his pleas of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his pleas of guilty.

    10.    **Agreed Guidelines Applications.**  With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

        a.    The Sentencing Guidelines do not bind the Court and are advisory in nature.  The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable."

        b.    The applicable Guidelines Manual is the one that took effect on November 1, 2016.

        c.    The applicable Guidelines section for Count 1 is U.S.S.G. § 2B1.1, which provides for a **base offense level of 6**;

        d.    While the facts are as agreed in paragraph 3, there is no stipulation between the parties regarding the legal issue of what portion of the loss amount is attributable to the defendant, and the parties remain free to advocate their respective positions.  The defendant understands that the Government's position on this issue is that pursuant to U.S.S.G. § 2B1.1(b)(1)(H), a 14-level enhancement applies, based on a loss amount greater than $550,000 but less than $1,500,000; and

        e.    The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently.  Therefore, he is entitled to **a three-level reduction** pursuant to § 3E1.1(b) of the Sentencing Guidelines.  The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the

26

defendant (1) fails to abide by all of the terms and conditions of this plea agreement, any supplement thereto, and his pretrial release; or (2) attempts to withdraw his guilty plea, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility.

   f. The defendant appears to have a **criminal history category of I**.  The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office.

   g. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does <u>not</u> bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels.  Additionally, the failure of the Court to accept these stipulations will not, as outlined in paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty.

   h. The United States agrees not to seek an upward departure from the Guidelines or a sentence outside the Guidelines range.  **The defendant remains free to argue for any sentence authorized by law, including a downward departure from the Guidelines or a variance from the Guidelines range.**  The agreement by the Government to not seek a departure from the Guidelines is not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable."

   i. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum.  The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment.  The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay.

   j. The defendant understands and agrees that the factual admissions contained in paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed upon Guidelines calculations contained in this agreement.

27

11.    **Effect of Non-Agreement on Guidelines Applications.**    The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in paragraph 10 and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

12.    **Change in Guidelines Prior to Sentencing.**    The defendant agrees that, if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by the defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option.   If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

13.    **Government's Reservation of Rights.**    The defendant understands that the United States expressly reserves the right in this case to:

   a.    oppose or take issue with any position advanced by the defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

   b.    comment on the evidence supporting the charges in the information;

   c.    oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed, and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

   d.    oppose any post-conviction motions for reduction of sentence, or other relief.

28

14.   **Defendant's Cooperation**.

a.   The defendant agrees to cooperate fully and truthfully with the United States before and after he is sentenced, including but not limited to the following:

i.   The defendant agrees to provide all information concerning his knowledge of, and participation in, the offenses charged in the information, and any other crimes about which he has knowledge;

ii.   The defendant agrees that he will not falsely implicate any Person or Entity and will not protect any Person or Entity through omission or false or misleading information and that all information provided will be truthful, complete and accurate;

iii.   The defendant agrees to testify as a witness before any grand jury, hearing, or trial when requested to do so by the United States;

iv.   The defendant agrees to hold himself reasonably available for any interviews the United States may require.  The defendant waives any right to the presence of counsel at such meetings, debriefings, or pretrial preparation sessions.  The parties agree that no prior consultation with defense counsel shall be necessary to conduct these meetings, debriefings or interviews, unless his attorney specifically requests such notice;

v.   The defendant agrees to provide the United States with all documents or other items under his control that may pertain to any criminal violations;

vi.   The defendant understands that his cooperation shall be provided to any local, state, and federal law enforcement agency deemed appropriate by the United States and that he may be called upon as a witness by any authority that has been provided his cooperation.  The defendant further understands that it will be necessary for the United States to disclose this cooperation agreement to opposing counsel if he is called or scheduled to testify as a witness for the prosecution in any future court hearing or trial in accordance with this cooperation agreement.

vii.   The defendant agrees and understands that this cooperation agreement requires that his cooperation continues even after the

29

time he is sentenced. Failure to continue to cooperate after a sentence is imposed constitutes a basis to void this agreement by the United States and will allow the Government to re-institute charges that were previously dismissed pursuant to this agreement;

viii. The defendant agrees that if the United States determines that he has not provided full and truthful cooperation, or has committed any local, state, or federal crime between the date of this agreement and his sentencing, or has otherwise violated any other provision of the entire plea agreement, the entire plea agreement may be voided by the United States and the defendant shall be subject to prosecution for any federal crime of which the United States has knowledge including, but not limited to, perjury, obstruction of justice, and any substantive offenses arising from this investigation. Such prosecution may be based upon any information provided by the defendant during the course of his cooperation, or upon leads derived therefrom, and this information may be used as evidence against him. In addition, the defendant's previously entered plea of guilty will remain in effect and cannot be withdrawn. Further, any prosecution which is not barred by the applicable statute of limitations on the date of the signing of the agreements may be commenced against the defendant in accordance with the agreements, notwithstanding the expiration of the statute of limitations between the time of signing the agreements and the commencement of the prosecution. In the event the publicly filed plea agreement and this addendum are signed on different days, the date of the earliest agreement shall be used as the starting point for the waiver of the statute of limitations. It is the specific intent of this plea agreement to waive any and all defenses based upon the statute of limitations with respect to any prosecution which is not barred by the statute of limitations on the date the agreements are signed by the defendant;

ix. The defendant understands and agrees that if he commits a local, state or federal crime (whether a felony or misdemeanor) or violates any conditions of his bond while he is cooperating with the United States, a motion for downward departure will not be filed by the Government on behalf of defendant.

b. "Substantial assistance" within the meaning of 18 U.S.C. § 3553(e) has not yet been provided by the defendant. Upon the determination by the United States that the defendant has provided "substantial assistance," the United States,

30

pursuant to 28 U.S.C. § 994(n) and 18 U.S.C. § 3553(e), will request the Court to reduce the sentence the defendant would otherwise receive under the applicable statutes, or will request a sentence reduction pursuant to § 5K1.1 of the Sentencing Guidelines, or reductions under both the applicable statutes and the Guidelines. The United States reserves the right to make the sole determination as to whether and when the defendant has provided such substantial assistance and further whether to request a reduction generally or a specific sentence or sentence reduction.

c.      In exchange for the defendant's agreement to cooperate, the United States agrees not to use new information that the defendant might provide about his own criminal conduct except as specifically authorized by § 1B1.8 of the United States Sentencing Guidelines.  As such, this information may be revealed to the Court but may not be used against the defendant in determining the defendant's applicable Guidelines range or departing above his Guidelines range.   The defendant understands and agrees, however, that under U.S.S.G. § 1B1.8, there shall be no such restrictions on the use of the information: (1) previously known to the United States; (2) revealed to the United States by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; (4) in the event there is a breach of this agreement; or (5) in determining whether and to what extent a downward departure as a result of a government motion pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 is warranted.

d.      Moreover, in exchange for the defendant's agreement to cooperate, following the completion of the defendant's presentence investigation report and prior to any sentencing hearing in the Western District of Missouri, the United States Attorney for the Western District of Missouri agrees that he will approve the defendant's request, pursuant to Rule 20 of the Federal Rules of Criminal Procedure, to transfer this case to the Eastern District of Pennsylvania for sentencing, and will not object to the defendant's request that his sentences for this case and Eastern District of Pennsylvania Case No. 2:17-cr-00563-JD be run concurrently;

e.      In the event that the defendant's case is transferred to the Eastern District of Pennsylvania, the defendant understands and agrees that his obligations under the terms of this agreement continue, and any breach of any provision of this agreement could result in the transfer of this case back to the Western District of Missouri, if a sentence has not yet been entered, or in new or additional charges being brought in the Western District of Missouri.

f.      If the defendant commits any crimes, violates any conditions of release, or violates any term of this agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is

31

intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement.  The defendant, however, will remain bound by the terms of the agreement, and the terms of the plea agreement, and will not be allowed to withdraw his plea of guilty.

g.      The defendant also understands and agrees that in the event he violates any terms of the plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by his subsequent to this agreement.

15.    **Waiver of Constitutional Rights.**    The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

a.      the right to plead not guilty and to persist in a plea of not guilty;

b.      the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

c.      the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

d.      the right to confront and cross-examine the witnesses who testify against him;

e.      the right to compel or subpoena witnesses to appear on his behalf; and

f.      the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that, by pleading guilty, he waives or gives up those rights and that there will be no trial.  The defendant further understands that, if he pleads guilty, the Court may ask him questions about the offenses to which he pleaded guilty, and if the defendant answers those

32

questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands that he has pleaded guilty to felony offenses and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

16.    **Waiver of Appellate and Post-Conviction Rights.**

a.    The defendant acknowledges, understands and agrees that, by pleading guilty pursuant to this plea agreement, he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct; and

b.    The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) a sentence imposed in excess of the statutory maximum. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

17.    **Financial Obligations.**    By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

a.    The Court must order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with all other uncharged, related criminal activity. The offense conduct involves theft from an organization receiving Federal funds. Because Alternative Opportunities, Inc., and Preferred Family Healthcare, Inc., were nonprofit organizations that received funding almost exclusively from Federal and state entities, and at the time the defendant committed the offense charged in the information AO and PFH, by and through its executives named in the information, engaged in substantial activities that were illegal and contrary to public policy, the parties agree to recommend the Court order restitution to the United States and the states that funded the Charity, in the total amount stolen as a result of the offense charged in the Information, with the payments apportioned corresponding to the United States' and states' percentage shares of contribution to

33

AO's and PFH's gross income, to be determined in connection with the Presentence Investigation;

b.       The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine;

c.       The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control, directly or indirectly, including assets and property held by a spouse, nominee or other third party.  The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full;

d.       Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit: (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office.  The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility;

e.       At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution;

f.       The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence;

g.       The defendant understands that a Special Assessment will be imposed as part of the sentence in this case.  The defendant promises to pay the Special Assessment of **$100** by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing;

h.       The defendant certifies that he has made no transfer of assets or property for the purpose of: (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; or (3) hindering efforts of the USAO to enforce such financial obligations.  Moreover, the defendant promises that he will make no such transfers in the future; and

34

i.      In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

18.      **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

19.      **Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

20.      **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his pleas of guilty.

The defendant also understands and agrees that, in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against him in any and all criminal proceedings.  The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

21.    **Defendant's Representations.**  The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel.  The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement.   The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his pleas of guilty.

22.    **No Undisclosed Terms.**  The United States and the defendant acknowledge and agree that the above stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

23.   **Standard of Interpretation.**   The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.  The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

THOMAS M. LARSON
Acting United States Attorney

By

Dated:  _12/18/2017_          _/s/ Steven M. Mohlhenrich_
STEVEN M. MOHLHENRICH
Assistant United States Attorney

ANNALOU TIROL
Acting Chief, Public Integrity Section

By

Dated:  _12/18/2017_          _/s/ Steven M. Mohlhenrich for_
SEAN F. MULRYNE
Trial Attorney, Public Integrity Section
United States Department of Justice

37

I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the information.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines.  I have read this plea agreement and carefully reviewed every part of it with my attorney.  I understand this plea agreement and I voluntarily agree to it.


Dated:   _12/18/2017_              _/s/ Donald Andrew Jones_
                                   DONALD ANDREW JONES
                                   Defendant


I am defendant Donald Andrew Jones's attorney.  I have fully explained to him his rights with respect to the offense charged in the information.  Further, I have reviewed with him the provisions of the Sentencing Guidelines that might apply in this case.  I have carefully reviewed every part of this plea agreement with him.  To my knowledge, Donald Andrew Jones's decision to enter into this plea agreement is an informed and voluntary one.


Dated:   _12/18/2017_              _/s/ Alan J. Tauber_
                                   ALAN J. TAUBER
                                   Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 17-03142-01-CR-S-RK |
| DONALD ANDREW JONES, | |
| Defendant. | |

## MOTION TO TRANSFER AND NOTICE OF
## RELATED CASES PURSUANT TO LOCAL RULE 83.9

Comes now the United States of America, by and through its undersigned counsel, and hereby notifies the Court that the above-captioned case is a related case to *United States v. David Carl Hayes,* Case No. 17-03070-01-CR-S-BCW, and accordingly, pursuant to Local Rule 83.9, requests that both cases be assigned to the district court judge with the lowest case number. The United States offers the following suggestions in support of the motion.

1.    On June 12, 2017, a three-count information against David Carl Hayes was filed and the case was assigned to United States District Court Judge Brian C. Wimes.    Count One of the information alleged that the named defendant being an agent of Alternative Opportunities, Inc., an organization receiving in each one-year period from July 1, 2010, through June 30, 2014, benefits in excess of $10,000 under Federal programs from the above-listed agencies, in a single and continuing course of conduct, embezzled, stole, obtained by fraud, and without authority knowingly converted to his own use, property worth at least $5,000.00 and under the care, custody, and control of such organization, that is funds totaling approximately $1,965,476.81; all in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.    Count Three of the information alleged that the named defendant, a resident of Springfield, Missouri, willfully made

and subscribed a joint U.S. Individual Income Tax Return, IRS Form 1040, for the calendar year 2013, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.   That joint U.S. Individual Income Tax Return, which was prepared and signed in the Western District of Missouri, and was filed with the Internal Revenue Service, reported on line 22 total income of $76,829.00, whereas, as he then and there knew, he had received additional income totaling at least $776,340.42, namely, funds obtained from Alternative Opportunities, Inc.; in violation of Title 26, United States Code, Section 7206(1).

2.   On December 18, 2018, the Information, consisting of a single count and a forfeiture allegation, was filed in the instant case, and defendant Donald Andrew Jones waived indictment, entered his plea of guilty.   The Information alleges that from in or about April 2011, until in or about January 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, the defendant, Donald Andrew Jones, in violation of Title 18, United States Code, Section 371, conspired and agreed with Person #1, Person #2, Person #3, Person #4, Person #7, and with others known and unknown to the United States Attorney, to execute a scheme whereby Person #1, Person #2, Person #3, and Person #4, being agents of Alternative Opportunities, Inc., and Preferred Family Healthcare, Inc., organizations receiving in each one-year period from July 1, 2010, through June 30, 2017, benefits in excess of $10,000 under the Federal programs set forth above, embezzled, stole, obtained by fraud, and without authority knowingly converted to their use, property worth at least $5,000 and under the care, custody, and control of such organization, that is funds totaling approximately $973,807.28; in violation of Title 18, United States Code, Section 666(a)(1)(A) and (a)(2).

2

3.      Both the instant criminal case filed against Donald Andrew Jones, and Counts One and Three of *United States v. David Carl Hayes,* Case No. 17-03070-01-CR-S-BCW, arise out of the same investigation and set of facts, i.e., both stole from the same charity, an organization receiving annual benefits in excess of $10,000 under Federal programs, in the same time period, in Greene County, within the Western District of Missouri.

4.      The United States notes that on June 12, 2017, Mr. Hayes's plea of guilty was accepted by Judge Wimes (Doc. 13), and on October 3, 2017 the final Pre-Sentence Investigation Report was filed in that case (Doc. 18).   Subsequently, on November 21, 2017, the United States was informed that David Carl Hayes died, apparently by suicide.   Upon completion of the investigation into the circumstances of Mr. Hayes's death, and receipt by the United States of a death certificate, the United States plans to file a motion to dismiss that criminal matter.

5.      However, as required by United States Attorney's Office policy, and in the interest of promoting judicial economy and efficiency, the United States respectfully suggests that the criminal proceedings for these related criminal cases should be presided over by a single District Court Judge.   Having a single judge preside over related cases is a more efficient use of judicial resources since only one judge needs to acquire a familiarity with the relevant facts. When related cases are filed, the judge who presides over the first filed case should preside over the later filed cases.[1]

WHEREFORE, the United States respectfully moves for an order transferring the above-captioned matter to the Honorable Brian C. Wimes, the District Court Judge, who has the lowest numbered or first filed of these related cases.

---

[1]*See* Local Civil Rule 83.9, which states a preference for related cases to be heard by the judge assigned to the lowest numbered or first filed case.

3

Respectfully submitted,

THOMAS M. LARSON
Acting United States Attorney


By      */s/ Steven M. Mohlhenrich*
        STEVEN M. MOHLHENRICH
        Assistant United States Attorney
        901 St. Louis Street, Suite 500
        Springfield, Missouri 65806-2511
        (417) 831-4406


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on December 18, 2017, to the CM/ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.


*/s/ Steven M. Mohlhenrich*
STEVEN M. MOHLHENRICH
Assistant United States Attorney

4

1

2                   IN THE UNITED STATES DISTRICT COURT FOR THE
                        WESTERN DISTRICT OF MISSOURI
3                          SOUTHERN DIVISION

4   UNITED STATES OF AMERICA,      ) Case No. 17-03142-01-CR-S-RK
                                   )
5              Plaintiff,          ) Springfield, Missouri
                                   ) December 18, 2017
6   v.                             )
                                   )
7   DONALD ANDREW JONES,           )
                                   )
8              Defendant.          )
    _____)

9
              TRANSCRIPT OF HEARING ON WAIVER OF INDICTMENT,
10           FILING OF INFORMATION AND PLEA TO INFORMATION
                  BEFORE THE HONORABLE DAVID P. RUSH
11                UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:            Mr. Steven M. Mohlhenrich
                                  Assistant United States Attorney
14                                901 St. Louis St., Ste. 500
                                  Springfield, MO  65806
15                                (417) 831-4406

16  For the Defendant:           Mr. Alan J. Tauber
                                  1221 Locust St., 3rd Floor
17                                Philadelphia, PA  19107
                                  (215) 575-0702
18
    Court Audio Operator:         Ms. Karla Berziel
19
    Transcribed by:               Rapid Transcript
20                                Lissa C. Whittaker
                                  1001 West 65th Street
21                                Kansas City, MO  64113
                                  (816) 914-3613
22

23

24

25  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

2

1    (Court in Session at 9:02 a.m.)

2        THE COURT:  Calling in *United States vs. Donald Andrew*

3    *Jones*.  The defendant appears in person along with his attorney,

4    Mr. Alan Tauber.  The United States appears by Assistant United

5    States Attorney, Mr. Steve Mohlhenrich.  This matter is set this

6    morning for a Waiver of Indictment, the filing of a one-count

7    Information which also contains a Forfeiture Allegation and then

8    a plea to the Information and the Forfeiture Allegation pursuant

9    to a written Plea Agreement.  Mr. Jones, have you seen the

10   Information that the Government proposes to file in your case?

11       MR. JONES:  Yes, I have, Your Honor.

12       THE COURT:  And, Mr. Tauber, if you don't mind, these

13   microphones are directional -- yeah.  Thank you.  I can hear just

14   fine but our transcriptionist sometimes has a little difficulty

15   picking up and so I want you to know I can hear you just fine but

16   I want to make sure that she's able to transcribe the hearing.

17   Mr. Jones, do you understand that because the maximum penalty

18   contained in the Information exceeds one year, that you have an

19   absolute right to have that matter presented to the federal Grand

20   Jury?

21       MR. JONES:  Yes, I do, Your Honor.

22       THE COURT:  Now I'm going to briefly describe for you

23   the Grand Jury process and then I'll ask you just two follow-up

24   questions in relationship to the Waiver of Indictment.  A Grand

25   Jury would consist of not more than 23 persons and not more than

3

16 persons and they would listen to the evidence presented by the
United States.  If not satisfied with the scope of that evidence,
they could subpoena evidence themselves.  And, if, after hearing
it all, they found probable cause to believe that this offense
had been committed and you committed it, then they would return
an Indictment and that would be the charge against you.  If they
did not so find this charge could not be filed.  The only way
that the Government can file this Information without going
through the Grand Jury process is with your informed knowledge
and consent.  Now, you and your attorney have signed a Waiver of
Indictment.  Do you understand your right to have this matter
presented to the federal Grand Jury?

            MR. JONES:  Yes, I do, Your Honor.

            THE COURT:  And is it your desire to give up that right
understanding that that will allow the Government to file this
Information?

            MR. JONES:  Yes, I do, Your Honor.

            THE COURT:  I am going to sign the Waiver of Indictment
and find that it has been made with the defendant's informed
knowledge and consent, and the record should reflect that the
Information is hereby filed.  Mr. Jones, you have also signed a
consent to have these proceedings for a plea of guilty before a
United States Magistrate Judge, with the understanding that a
United States District Judge, a judge of higher jurisdiction,
will keep your case for acceptance of the plea of guilty and

4

sentencing.  Even though you signed this consent you have a
right, if you wish, to appear before a United States District
Judge, a judge of higher jurisdiction, for these proceedings.  At
any appearance before the District Judge, you're presumed
innocent until such time, if ever, as the Government establishes
your guilt beyond a reasonable doubt to the satisfaction of the
judge or jury.  You always have a right to be present and to
confront and cross-examine witnesses.  You have a right to use
the power of the court to subpoena evidence on your behalf and
you have a right to testify or not testify as you would choose.
And if you chose not to testify it would not be held against you
as that is your right.  If, after understanding the charge
against you, the range of punishment, if convicted, and your
right to appear before a District Judge, if you wish, you may
waive or give up that right and proceed this morning before the
Magistrate Judge.  As I indicated, you have also signed such a
consent.  Do you understand that you have a right to appear
before a United States District Judge, a judge of higher
jurisdiction, for these proceedings?

          MR. JONES:  Yes, I do, Your Honor.

          THE COURT:  And is it your desire to give up that right
and proceed this morning before the Magistrate Judge?

          MR. JONES:  Yes, it is.

          THE COURT:  Mr. Jones, do you understand the charge
against you in Count One of the Information that's been filed in

5

1   this case?

2           MR. JONES:  Yes, I do, Your Honor.

3           THE COURT:  And do you understand that if convicted of

4   the charge in the Information which is -- there is only one count

5   in the Information.  You understand that the maximum penalty the

6   court may impose is not more than five years imprisonment, not

7   more than a $250,000 fine, not more than three years supervised

8   release, mandatory restitution, and a $100 mandatory special

9   assessment?

10          MR. JONES:  Yes, I do, Your Honor.

11          THE COURT:  To the charge in the Information, how do you

12  wish to plead, guilty or not guilty?

13          MR. JONES:  I plead guilty.

14          THE COURT:  Do you understand the Forfeiture Allegation

15  set forth in the information that's been filed in this case?

16          MR. JONES:  I do, Your Honor.

17          THE COURT:  Do you understand that if you admit those

18  allegations that your interest in the property listed in the

19  Forfeiture Allegation would be forfeited to the United States?

20          MR. JONES:  Yes, Your Honor.

21          THE COURT:  And do you admit those allegations?

22          MR. JONES:  Yes, I do, Your Honor.

23          THE COURT:  Would you please rise and raise your right

24  hand?

25              DONALD ANDREW JONES, DEFENDANT, SWORN

6

1    THE COURT:  Mr. Jones, has anyone made any threat of any

2 kind to force you to plead guilty or give up any of the other

3 rights that we've discussed this morning?

4    MR. JONES:  No, Your Honor.

5    THE COURT:  You've signed a Plea Agreement.  Have you

6 read that agreement and gone over it with your attorney?

7    MR. JONES:  Yes, I have, Your Honor.

8    THE COURT:  Do you understand what's contained within

9 the Plea Agreement?

10    MR. JONES:  Yes, I do, Your Honor.

11    THE COURT:  Other than what is contained in the Plea

12 Agreement, has anyone made any promise of any kind to induce you

13 or overcome your will to get you to plead guilty or give up any

14 of the other rights we've discussed this morning?

15    MR. JONES:  No, Your Honor.

16    THE COURT:  I mentioned to you that there was a

17 supervised release term of not more than three years that could

18 be imposed in your case.  Do you understand that if that term

19 were imposed and then revoked for any reason, that you could be

20 required to serve an additional term of imprisonment of not more

21 than two years, and if that happened, you would receive no credit

22 for any other time you had spent either in custody or on release?

23    MR. JONES:  Yes, Your Honor.

24    THE COURT:  And do you understand that the District

25 Court could then impose an additional term of supervised release,

7

1  which is governed by the maximum of the statute, minus any time

2  you'd spent in custody as a result of a violation?

3          MR. JONES:  I understand, Your Honor.

4          THE COURT:  Do you understand that from a sentence

5  imposed in your case that there is no parole?

6          MR. JONES:  Yes, Your Honor.

7          THE COURT:  Do you understand that there are Sentencing

8  Guidelines to which the District Court or the sentencing court

9  would refer to in an advisory capacity when attempting to fashion

10  a reasonable sentence in your case?

11          MR. JONES:  Yes, Your Honor.

12          THE COURT:  There are guideline calculations in your

13  Plea Agreement.  Have you discussed the guidelines with your

14  attorney?

15          MR. JONES:  Yes, sir.

16          THE COURT:  And do you understand them?

17          MR. JONES:  Yes, I do, Your Honor.

18          THE COURT:  Do you understand that the final decision as

19  to how the guidelines are calculated and ultimately what sentence

20  will be imposed rests with the District Judge?

21          MR. JONES:  Yes, I do, Your Honor.

22          THE COURT:  If the District Judge would calculate the

23  guidelines differently from what is in the Plea Agreement, and

24  from what you've discussed with your attorney, that fact would

25  not give you the right to withdraw or change your plea of guilty.

8

1  Do you understand that?

2  MR. JONES:  Yes, I do, Your Honor.

3  THE COURT:  Once the District Judge establishes the

4  advisory guideline range, in some circumstances, you could be

5  sentenced above that range and, in other circumstances, you could

6  be sentenced below that range.  And again, the judge's decision,

7  if you disagreed, would not give you the right to withdraw your

8  plea of guilty.  Do you understand that?

9  MR. JONES:  Yes, I do, Your Honor.

10  THE COURT:  Now, Mr. Jones, you have a right to a trial

11  by jury with all the protections that I explained to you at the

12  beginning of these proceedings.  Do you understand your right to

13  a trial by jury?

14  MR. JONES:  Yes, I do, Your Honor.

15  THE COURT:  And do you understand that if the court

16  accepts your plea of guilty that there won't be a trial?

17  MR. JONES:  Yes, I do, Your Honor.

18  THE COURT:  I'm going to ask you about the offense

19  charged in the Information and in the Forfeiture Allegation.  I

20  would remind you that you are under oath.  You must answer

21  truthfully.  Any false answers could result in charges of false

22  swearing or perjury.  You always have the right to remain silent.

23  And I want to refer you to your Plea Bargain Agreement,

24  specifically page 2 -- the top of page 2, Paragraph 3 or Section

25  3, which is entitled in bold **Factual Basis for Guilty Plea**.  That

9

1 Section 3 starts at the top of page 2 and then continues on until

2 the middle of page 21.  Have you read Section 3 and gone over it

3 with Mr. Tauber?

4          MR. JONES:  Yes, I have, Your Honor.

5          THE COURT:  And are the statements contained in Section

6 3 true?

7          MR. JONES:  Yes, Your Honor.

8          THE COURT:  Mr. Tauber, you've had access to the

9 Government's discovery file in this case, have you not?

10          MR. TAUBER:  Yes, Your Honor.

11          THE COURT:  And based upon your review of the discovery

12 file, are you satisfied if put to proof, that the United States

13 could make a submissible case as to all the elements pertaining

14 to Count One of the Information and the Forfeiture Allegation set

15 forth in the Information as set forth in Section 3 of the Plea

16 Agreement?

17          MR. TAUBER:  Yes, I am.

18          THE COURT:  There is an adequate factual basis for the

19 plea of guilty to the Information and the Forfeiture Allegation.

20 I find that the plea is voluntary and did not result from force,

21 threats or promises other than those set forth in the Plea

22 Agreement.  Mr. Jones, you are represented in this case by Mr.

23 Tauber.  Have you had enough time to talk with him about your

24 case?

25          MR. JONES:  Yes, I have, Your Honor.

10

1          THE COURT:  Are you satisfied with the advice that he's
2    given you?

3          MR. JONES:  Yes, I am, Your Honor.

4          THE COURT:  The law requires me to ask you if this
5    morning you are on any medication prescribed by a physician or
6    any drugs or alcohol of any kind which would affect your ability
7    to understand these proceedings?

8          MR. JONES:  No, Your Honor.

9          THE COURT:  The Plea Bargain Agreement that you've
10   signed contains what we refer to as an appeal waiver.  And I'd
11   like to direct you again back to your Plea Bargain Agreement.
12   This time to the middle of page 32.  Excuse me, it's actually
13   Paragraph 16 on page 33.  Direct your attention to Paragraph 16
14   on page 33 which is entitled in bold **Waiver of Appellate and**
15   **Post-Conviction Rights.**  Have you read Paragraph 16 and gone over
16   it with your attorney?

17         MR. JONES:  Yes, I have, Your Honor.

18         THE COURT:  And do you understand that by signing this
19   Plea Agreement that you've given up those rights to appeal as set
20   forth in Paragraph 16?

21         MR. JONES:  Yes, I have, Your Honor.  Yes, I do, Your
22   Honor.

23         THE COURT:  Understanding that and the other matters
24   that we've discussed this morning, is it your desire for the
25   court to accept the plea of guilty?

11

1           MR. JONES:  Yes, Your Honor.

2           THE COURT:  Mr. Mohlhenrich, on behalf of the United

3  States, do you have any other record under Rule 11 that you think

4  I need to make?

5           MR. MOHLHENRICH:  No, Your Honor.  Thank you.

6           THE COURT:  Mr. Tauber, on behalf of the defendant, do

7  you have any other record under Rule 11 you think I need to make?

8           MR. TAUBER:  No, Your Honor.

9           THE COURT:  I will recommend the plea of guilty be

10 accepted and I will order a Presentence Investigation to be

11 conducted by the Probation Office.  Mr. Jones, I've been advised

12 that the United States is not asking for detention in this

13 matter.  Therefore -- is that correct, Mr. Mohlhenrich?

14          MR. MOHLHENRICH:  That's correct, Your Honor.

15          THE COURT:  Therefore, I have prepared a bond and order

16 setting conditions of release which you've reviewed with the

17 Pretrial Services Officer and you've signed them.  Do you

18 understand the conditions of your release and the penalties

19 should you violate any or fail to appear?

20          MR. JONES:  Yes, I do, Your Honor.

21          THE COURT:  And do you agree to abide by them?

22          MR. JONES:  Yes, I do, Your Honor.

23          THE COURT:  I will order you released on these

24 conditions.  If I haven't already made this record, I will order

25 a Presentence Investigation -- all right -- to be conducted by

12

1  the Probation Office.  Anything further from either side?

2          MR. MOHLHENRICH:  No, Your Honor.  Thank you.

3          MR. TAUBER:  No, no.  Thank you.

4          THE COURT:  All right.  Mr. Jones, good luck to you,

5  sir.

6          MR. JONES:  Thank you, sir.

7          THE COURT:  With that, we'll be in recess.

8                  (Court Adjourned at 9:14 a.m.)

13

1

2

3

4

5
        I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
above-entitled matter.

6

7

8
      /s/ Lissa C. Whittaker     December 27, 2017
      Signature of transcriber       Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(Rev. 12-16) Petition for Admission Pro Hac Vice

# IN THE UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF MISSOURI

## PETITION FOR ADMISSION PRO HAC VICE

### Affidavit of Movant

I, Lisa Nouri, Esq. _____, an active member in good standing of the Bar of the United States District Court for the Western District of Missouri, request that this court admit pro hac vice, Alan J. Tauber, Esq. _____, an attorney admitted to practice in a United States District Court, but not admitted to the Bar of this court, who will be counsel for the Donald Jones _____, in the case(s) listed below. I am aware that the local rules of this court require that I participate in the preparation and presentation of said case(s), and that I accept service of all papers served. I also understand and agree that if the admittee does not sign up to receive CM ECF filings, I will be responsible for notifying the admittee of all papers served by CM ECF.

_____
**Signature of Movant/Attorney**

_____
**Date**

816-547-5625
**Phone**

32806
**MO Bar Number**

Lisa Nouri, Esq.
**Address**

2526 Holmes Street

Kansas City, MO  64108

### Affidavit of Proposed Admittee

I, Alan J. Tauber, Esq. _____, certify that I reside outside the boundaries of the Western District of Missouri and I am not admitted to the Bar of this court. I am a member in good standing in the state(s) of Pennsylvania and New Jersey _____ and the United States District Court(s) of Eastern District of Pa. and District of New Jersey _____. (Attach additional page if necessary.) Pursuant to Local Rule 83.5(h), I certify I am a member in good standing in all bars of which I am a member. I understand that if this court grants me admission pro hac vice, the movant bringing this motion must participate in the preparation and presentation of the matters listed below, and must accept service of all papers served. I am aware that I can register to receive CM ECF filings. I understand and agree that should I choose not to register for CM ECF, I will arrange with movant to keep me advised of papers served and filed in this case.

**Case Number(s):**
Not assigned

**Case Title(s)**
United States v. Donald Jones

Date: 12-28-17

Signature: _____

**State Bar of Residence & Bar Number:**
Pennsylvania  No. 57353

**Address:** 1221 Locust Street

Philadelphia, PA 19107

**Phone:** 215-313-7188

**Email:** atauber@lindyandtauber.com

Pursuant to WDMO Local Rule 83.5(h) a fee of $50 is required for each case in which the attorney is seeking admittance. (Fee increases to $100 on January 1, 2018.)

```
MIME-Version:1.0
From:ecfMOW.notification@mow.uscourts.gov
To:cmecf_atynotifications@mow.uscourts.gov
Bcc:
--Case Participants: Alan J. Tauber (atauber@lindyandtauber.com), Steven M. Mohlhenrich
(caseview.ecf@usdoj.gov, jacki.dean-swineburg@usdoj.gov, shawnette.cameron@usdoj.gov,
steven.mohlhenrich@usdoj.gov), Lisa G. Nouri (lisanouri_atty@hotmail.com), District Judge
Roseann Ketchmark (courtney_stout@mow.uscourts.gov, elizabeth_russell@mow.uscourts.gov,
madison_perry@mow.uscourts.gov, roseann_ketchmark@mow.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:6028550@mow.uscourts.gov
Subject:Activity in Case 6:17-cr-03142-RK USA v. Jones Order on Motion to Appear Pro Hac
Vice
```
Content−Type: text/html

## U.S. District Court

## Western District of Missouri

## Notice of Electronic Filing

The following transaction was entered on 1/2/2018 at 2:21 PM CST and filed on 1/2/2018

**Case Name:**       USA v. Jones

**Case Number:**     6:17−cr−03142−RK

**Filer:**

**Document Number:** 15(No document attached)

**Docket Text:**
 ORDER granting [14] motion to appear pro hac vice entered by Clerk of Court 1400 U.S.
Courthouse, 222 John Q. Hammons Parkway, Springfield, Missouri 65806.

Counsel is entered as to Donald Andrew Jones (1) This is a TEXT ONLY ENTRY. No document is
attached.(Geiser, Angel)


**6:17−cr−03142−RK−1 Notice has been electronically mailed to:**

Lisa G. Nouri    lisanouri_atty@hotmail.com

Steven M. Mohlhenrich    steven.mohlhenrich@usdoj.gov, CaseView.ECF@usdoj.gov,
Jacki.Dean−Swineburg@usdoj.gov, shawnette.cameron@usdoj.gov

Alan J. Tauber    atauber@lindyandtauber.com

**6:17−cr−03142−RK−1 It is the filer's responsibility for noticing the following parties by other means:**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN WESTERN DIVISION

| UNITED STATES OF AMERICA | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **Case No. 17-03142-01-CR-S-RK** |
| | § | |
| DENNED ANDREW ROSENOUS | § | |
| | § | |
| **Defendant.** | § | |

## ORDER

On 12/18/2017, defendant appeared before United States Magistrate Judge David P. Rush and entered a plea of guilty to the sole Count contained in the Information filed 12/18/2017 (doc. 2). On 12/18/2017, Judge Rush issued his Report and Recommendation (doc. 7).

Upon careful and independent review, this Court finds that defendant's plea was knowledgeable and voluntary and that the offense charged is supported by an independent basis in fact containing each of the essential elements of such offense. Accordingly, this Court hereby adopts and incorporates as its own Opinion and Order the Report and Recommendation of United States Magistrate Judge David P. Rush.

Accordingly, it is hereby ORDERED that defendant's plea of guilty is accepted and defendant is adjudged guilty. The defendant's sentencing hearing will be scheduled and the parties notified of the date and time of sentencing.

SO ORDERED.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED:  January 3, 2018.

```
MIME-Version:1.0
From:ecfMOW.notification@mow.uscourts.gov
To:cmecf_atynotifications@mow.uscourts.gov
Bcc:
--Case Participants: Alan J. Tauber (atauber@lindyandtauber.com), Steven M. Mohlhenrich
(caseview.ecf@usdoj.gov, jacki.dean-swineburg@usdoj.gov, shawnette.cameron@usdoj.gov,
steven.mohlhenrich@usdoj.gov), Lisa G. Nouri (lisanouri_atty@hotmail.com), District Judge
Roseann Ketchmark (courtney_stout@mow.uscourts.gov, elizabeth_russell@mow.uscourts.gov,
madison_perry@mow.uscourts.gov, roseann_ketchmark@mow.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:6032886@mow.uscourts.gov
Subject:Activity in Case 6:17-cr-03142-RK USA v. Jones Order on motion for order
```
Content−Ty e: te t/html

## ￮￮￮District Court

### ￮ estern District of ￮ issouri

## Notice of Electronic Filing

The following transaction was entered on 1/4/2018 at 10:34 AM CST and filed on 1/4/2018

| | |
|---|---|
| **Case Name:** | USA v. Jones |
| **Case Number:** | 6:17−cr−03142−RK |
| **Filer:** | |
| **Document Number:** | 17(No document attached) |

**Docket Text:**
 ORDER granting [11] motion for order to Transfer and Notice of Related Cases Pursuant to Local Rule 83.9 as to Donald Andrew Jones (1). Signed on January 4, 2018 by District Judge Roseann Ketchmark. This is a TEXT ONLY ENTRY. No document is attached.(Wheeler, LaTandra)


**6:17−cr−03142−RK−1 Notice has been electronically mailed to:**

Lisa G. Nouri    lisanouri_atty@hotmail.com

Steven M. Mohlhenrich    steven.mohlhenrich@usdoj.gov, CaseView.ECF@usdoj.gov, Jacki.Dean−Swineburg@usdoj.gov, shawnette.cameron@usdoj.gov

Alan J. Tauber    atauber@lindyandtauber.com

**6:17−cr−03142−RK−1 It is the filer's responsibility for noticing the following parties by other means:**

```
MIME-Version:1.0
From:ecfMOW.notification@mow.uscourts.gov
To:cmecf_atynotifications@mow.uscourts.gov
Bcc:
--Case Participants: Alan J. Tauber (atauber@lindyandtauber.com), Steven M. Mohlhenrich
(caseview.ecf@usdoj.gov, jacki.dean-swineburg@usdoj.gov, shawnette.cameron@usdoj.gov,
steven.mohlhenrich@usdoj.gov), Lisa G. Nouri (lisanouri_atty@hotmail.com), District Judge
Brian C. Wimes (shelly_carritt@mow.uscourts.gov), District Judge Roseann Ketchmark
(courtney_stout@mow.uscourts.gov, elizabeth_russell@mow.uscourts.gov,
madison_perry@mow.uscourts.gov, roseann_ketchmark@mow.uscourts.gov)
--Non Case Participants: ProbationAll (mow_dqa@mow.uscourts.gov), Statistics Clerk
(kendra_travis@mow.uscourts.gov)
--No Notice Sent:

Message-Id:6032901@mow.uscourts.gov
Subject:Activity in Case 6:17-cr-03142-BCW USA v. Jones Order Transferring/Reassigning Case
```
Content−Ty e: te t/html

## ▢▢▢District Court

## ▢ estern District of ▢ issouri

## Notice of Electronic Filing

The following transaction was entered on 1/4/2018 at 10:37 AM CST and filed on 1/4/2018

| | |
|---|---|
| **Case Name:** | USA v. Jones |
| **Case Number:** | 6:17−cr−03142−▢C▢ |
| **Filer:** | |
| **Document Number:** | 18(No document attached) |

**Docket Text:**
 **ORDER TRANSFERRING CASE as to Donald Andrew Jones. Case transferred to District Judge Brian C. Wimes for all further proceedings. District Judge Roseann Ketchmark no longer assigned to case. Signed on January 4, 2018 by District Judge Roseann Ketchmark.This is a TEXT ONLY ENTRY. No document is attached.(Wheeler, LaTandra)**

**6:17−cr−03142−▢C▢ −1 Notice has been electronically mailed to:**

Lisa G. Nouri     lisanouri_atty@hotmail.com

Steven M. Mohlhenrich     steven.mohlhenrich@usdoj.gov, CaseView.ECF@usdoj.gov, Jacki.Dean−Swineburg@usdoj.gov, shawnette.cameron@usdoj.gov

Alan J. Tauber     atauber@lindyandtauber.com

**6:17−cr−03142−▢C▢ −1 It is the filer's responsibility for noticing the following parties by other means:**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

Plaintiff

vs.

DONALD ANDREW JONES

Defendant

Case No. 17-03142-01-CR-S-C

MOTION OF THE UNITED STATES FOR A PRELIMINARY ORDER
OF FORFEITURE AND ITS SUPPORTING SUGGESTIONS

The United States of America, by its undersigned counsel, respectfully submits its Motion

for a Preliminary Order of Forfeiture in the above-entitled case for the reasons set forth in the

following supporting suggestions.  A proposed order is submitted with this motion.

SUPPORTING SUGGESTIONS

1.      On December 18, 2017, the United States Attorney's Office for the Western District

of Missouri filed a one-count information against the defendant Donald Andrew Jones.  Count

One charged that the defendant conspired and agreed with others known and unknown to the

United States, to execute a scheme whereby agents of Alternative Opportunities, Inc., and

Preferred Family Healthcare, Inc., organizations receiving in each one-year period from July 1,

2010, through June 30, 2017,  benefits in excess of $10,000 under Federal programs, embezzled,

stole, obtained by fraud, and without authority knowingly converted to their use, property worth

at least $5,000 and under the care, custody, and control of such organization, that is funds totaling

approximately $73,807.28, in violations of 18 U.S.C. §§ 371 and  666(a)(1)(A) and (a)(2).

2.     The Forfeiture Allegation of the Information sought a Personal money judgment against the defendant Donald Andrew Jones for the amount 78,807.28 Pursuant to 18 U.S.C. 81(a)(1)(C) and 28 U.S.C. 2461, in that such sum in the aggregate, constitutes, or is derived from, Proceeds traceable to the offenses set forth in Count One.

3.     On December 18, 2017, the defendant Donald Andrew Jones entered into a Plea agreement with the United States in which he agreed to Plead guilty to Count One of the Information charging violations of 18 U.S.C. 371 and consented to the entry of a money judgment in the amount of 73,807.28.

4.     The Court's jurisdiction in this matter is founded u on 18 U.S.C. 81(a)(1)(C), which Provides that:

> Any Property, real or Personal, which constitutes or is derived from Proceeds traceable to a violation of . . . . of this title, or any offense constituting s ecified unlawful activity (as defined in section 1 56(c)(7) of this title), or a cons iracy to commit such offense

and 28 U.S.C. 2461(c), Provides that:

> f a erson is charged in a criminal case with a violation of Act of Congress for which the civil or criminal forfeiture of Property is authori ed, the Government may include notice of the forfeiture in the indictment or information ursuant to the Federal Rules of Criminal Procedure. f the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the Property as art of the sentence in the criminal case ursuant to the Federal Rules of Criminal Procedure and section 3554 of Title 18 United States Code. The Procedures in section 413 of the Controlled Substance Act (21 U.S.C. 853) a ly to all stages of a criminal forfeiture Proceedings, e ce t that subsection (d) of such section a lies only in cases in which the defendant is convicted of a violation of such Act.

5.     The United States has not, as of this date, identified s ecific assets that were derived

from the offense for which the defendant has been convicted.  Nor has the United States identified any property of the defendant that could be forfeited as a substitute asset in accordance with 21 U.S.C. 853(p).

6.     Accordingly, the United States seeks the entry of an Order of Forfeiture consisting of a personal money judgment against the defendant in the amount of 73,807.28, pursuant to Rule 32.2(b)(2)(C).  The United States requests that the Court orally announce the amount of the money judgment at the time of sentencing and that the Court include the amount of the money judgment in its Judgment and Commitment Order.  See Federal Rules of Criminal Procedure 32.2(b)(4)().

7.     The entry of an Order of Forfeiture in the form of a personal money judgment is specifically authorized by Rule 32.2(b)(1) and (c)(1) of the Federal Rules of Criminal Procedure. Such orders of forfeiture are commonplace.  *See United States v. Baker*, 227 F.3d 955 (7th Cir. 2000) (a forfeiture order may include a money judgment for the amount of money involved in the money laundering offense—the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond) *United States v. Candelaria-Silva*, 166 F.3d 19 (1st Cir. 1999) (criminal forfeiture order may take several forms: money judgment, directly forfeitable property, and substitute assets) *United States v. Davis*, 177 F. Supp. 2d 470 (E.D. Va. 2001) (same, following *Candelaria-Silva*) *United States v. Conner*, 752 F.2d 566, 576 (11th Cir. 1985) (because criminal forfeiture is *in personam*, it follows defendant—it is a money judgment against the defendant for the amount of money that came into his hands illegally—the Government is not required to trace the money to any specific asset) *United States v. Ginsburg*, 773 F.2d 798, 801–02 (7th Cir. 1985) (*en banc*) (criminal forfeiture is a personal judgment that requires the defendant

3

to pay the total amount derived from the criminal activity, regardless of whether the specific dollars received from that activity are still in his possession); *United States v. Amend*, 791 F.2d 1120, 1127 (4th Cir. 1986) (same); *United States v. Robilotto*, 828 F.2d 940, 945 (2d Cir. 1987) (following *Conner* and *Ginsburg*—the court may enter a money judgment for the amount of the illegal proceeds regardless of whether defendant retained the proceeds); *United States v. Navarro-Ordas*, 770 F.2d 959, 961 (11th Cir. 1985) (court may enter personal money judgment against the defendant for the amount of the illegally obtained proceeds); *United States v. Voigt*, 89 F.3d 1050, 1084, 1088 (3d Cir. 1996) (the Government is entitled to a personal money judgment equal to the amount of money involved in the money laundering offense); *United States v. Holland*, 160 F.3d 377, 380 (7th Cir. 1998) (defendant ordered to pay judgment equal to value of property concealed from bankruptcy court and subsequently laundered); *United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000) (*Corrado I*) (remanding case to the district court to enter money judgment for the amount derived from a RICO offense); *United States v. Saccoccia*, 823 F. Supp. 994, 1006 (D.R.I. 1993) (money judgment for the amount laundered, $136 million, entered against each defendant), *aff'd*, 58 F.3d 754 (1st Cir. 1995); *United States v. Sokolow*, 1995 WL 113073 at *1 (E.D. Pa. 1995) (because money is fungible, the Government need not receive the identical money involved in the money laundering offense so long as the amount involved is known), *aff'd*, 81 F.3d 397 (3d Cir. 1996); *United States v. Cleveland*, 1997 WL 537707 at *11 (E.D. La. 1997) (the Government is entitled to a money judgment equal to the amount of money that defendant laundered in money laundering case); *United States v. Stewart*, 1998 WL 720063 (E.D. Pa. 1998) (court enters money judgment for "aggregate sum of all money laundering counts for which defendant was convicted"), *aff'd as modified*, 185 F.3d 112 (3d Cir. 1999); *United States v. Henry*,

4

850 F. Supp. 681, 683 (M.D. Tenn. 1994) (court enters money judgment for $11,206, which was the amount of Medicare fraud proceeds defendant was convicted of laundering), *aff'd*, 64 F.3d 664, 1995 WL 478635 (6th Cir. 1995) (Table); *United States v. Delco Wire and Cable Co., Inc.*, 772 F. Supp. 1511 (E.D. Pa. 1991) (criminal forfeiture is "like a money judgment that runs against the defendant until satisfied in full"; judgment entered for $10 million, which was the amount of the racketeering proceeds).

8.      Once the Order of Forfeiture is entered, the Government may move at any time, pursuant to Rule 32.2(e)(1)(B), to amend the Order to forfeit specific property of the defendant, having a value up to the amount of the money judgment, as substitute assets.  *See United States v. Candelaria-Silva*, 166 F.3d 19 (1st Cir. 1999) (once the Government has obtained a money judgment, it may forfeit defendant's real property in partial satisfaction of that judgment); *United States v. Baker*, 227 F.3d 955 (7th Cir. 2000) (same); *United States v. Numisgroup Intl. Corp*, 169 F. Supp. 2d 133 (E.D.N.Y. 2001) (Rule 32.2(e) authorizes forfeiture of substitute assets to satisfy a money judgment, including a judgment based on the value of the missing proceeds and the value of the missing facilitating property); *United States v. Harrison*, 2001 WL 803695 (N.D. Ill. 2001) (entry of money judgment as part of preliminary order of forfeiture gives Government opportunity later to satisfy the judgment by seeking forfeiture of substitute assets; Rule 32.2(e)); *United States v. Davis*, 177 F. Supp.2d 470 (E.D. Va. 2001) (if property cannot be forfeited as directly traceable to the offense, it can be forfeited as a substitute asset and used to satisfy the money judgment).

9.      In accordance with the provisions of 21 U.S.C. § 853(p) and Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the United States requests that it be permitted to undertake whatever discovery is necessary to identify, locate, or dispose of property subject to forfeiture, or

substitute assets for such property.

W□EREFORE, the United States respectfully requests that this Court enter an order directing a money judgment in the amount of $973,807.28.

Respectfully submitted,

TI□OT□Y □. G□RRISON
United States □ttorney

By      _s Steven   .   o  l  enric_
STEVEN □ . □ O□L□ENRIC□
□ssistant United States □ttorney
901 St. Louis, Suite 500
Springfield, □ O 65806□2512
Telephone□(417) 831□4406


## CERTIFICATE OF SERVICE

I hereby certify that on □arch 1, 2018, the foregoing motion was electronically filed with the Clerk of the Court using the C□ □ECF system, for electronic delivery to all counsel of record.


_s Steven   .   o  l  enric_
STEVEN □ . □ O□L□ENRIC□
□ssistant United States □ttorney

6

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               **Plaintiff,**

      **v.**                             **Case No. 17-03142-01-CR-S-BCW**

DONALD ANDREW JONES,

              **Defendant.**

## ORDER OF FORFEITURE

This matter is before the Court on the Motion of the United States for a Preliminary Order of Forfeiture.

WHEREAS, on December 18, 2017, the defendant Donald Andrew Jones entered into a plea agreement with the United States in which he admitted the allegations of forfeiture and agreed to a money judgment in the amount of $973,807.28.

WHEREAS, the United States has filed a motion for an order of forfeiture which would consist of a personal money judgment against the defendant in the amount of $973,807.28.  The Court will orally announce the money judgment amount at the time of sentencing, and will include the amount in the Judgment and Commitment Order, and

WHEREAS, Rule 32.2(c)(1) provides that "no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment,"

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the defendant shall forfeit to the United States a sum in the amount of $973,807.28, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

IT IS FURTHER ORDERED that the United States District Court shall retain jurisdiction

in the case for the purpose of enforcing this Order; and

IT IS FURTHER ORDERED that pursuant to Rule 32.2(b)(4)(a), this Order of Forfeiture shall become final as to the defendant at the time of sentencing [or before sentencing if the defendant consents], and shall be made part of the sentence and included in the judgment; and

IT IS FURTHER ORDERED that pursuant to 21 U.S.C. § 853(p) and Rule 32.2(b)(3) the United States may undertake whatever discovery is necessary to identify, locate, or dispose of property subject to forfeiture, or substitute assets for such property; and

IT IS FURTHER ORDERED that the United States may, at any time, move pursuant to Rule 32.2(e) to amend this Order of Forfeiture to substitute property having a value not to exceed $973,807.28 to satisfy the money judgment in whole or in part; and

SO ORDERED:

Dated: March 13, 2018


/s/ Brian C. Wimes
BRIAN C. WIMES
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

2019 JUN 17 P 1: 17

UNITED STATES OF AMERICA,

Plaintiff,

v.                                              Case No. 17-03142-01-CR-S-BCW

DONALD ANDREW JONES,

Defendant.

CONSENT TO TRANSFER OF CASE FOR DISPOSITION
PURSUANT TO RULE 20, FED. R. CRIM. PRO.

I, DONALD ANDREW JONES, defendant, waived indictment and entered a plea of guilty to the
Information in the above-captioned case, which plea has been accepted by the Court.    Pursuant
to Rule 20 of the Federal Rules of Criminal Procedure, and consistent with Paragraph 14d of the
Plea Agreement (ECF No. 10, p. 31), I request transfer of this case and consent to the disposition
and sentencing of this case in the Eastern District of Pennsylvania, in which I am present.    I
hereby waive trial, disposition, and sentencing in the Western District of Missouri.

Dated: 8-9-19

DONALD ANDREW JONES, Defendant

Dated: 8-9-19

ALAN J. TAUBER
Counsel for Defendant

Dated: 6/14/19

STEVEN M. MOHLHENRICH
Assistant United States Attorney

Approved

TIMOTHY A. GARRISON
United States Attorney
for the Western District of Missouri

WILLIAM M. MCSWAIN
United States Attorney
for the Eastern District of Pennsylvania